STATE OF NORTH CAROLINA v. ROBERT CARLMAN BONDURANT

No. 426A82

(Filed 6 December 1983)

**1. Jury § 5.1— jury selection—proposed selection of jurors opposed and unopposed to capital punishment—correctly refused**

The trial judge correctly refused to permit jury selection in accordance with a method proposed by defendant in which the jury would have been composed of both those opposed and unopposed to capital punishment for the purpose of determining guilt and then, at the sentencing phase, replacing those opposed by alternates who are unopposed to the death penalty since such a method contravenes G.S. 15A-2000(a)(2) which contemplates that the same jury which determines guilt will recommend the sentence.

**2. Homicide § 21.5— first degree murder—sufficiency of evidence**

The evidence was sufficient to support a verdict of murder in the first degree where the evidence tended to show that defendant, in the front seat of a car which contained four other people, pointed a .45 caliber revolver at the victim's head; that there was no evidence that the decedent provoked this menacing gesture in any way; that another occupant of the car testified that defendant said to the victim "You don't believe I'll shoot you, do you?"; that each occupant of the car stated that defendant held the gun on the decedent for at least two minutes and that they were begging him not to shoot; that unmindful of their pleadings, defendant shot the victim in the head; and that the .45 caliber revolver was a "single action" type which required that the hammer had to be pulled back and set and the trigger pulled before it fired.

**3. Criminal Law § 170.2— improper question by prosecutor not requiring mistrial**

The trial court properly denied defendant's motion for a mistrial after, on cross-examination of defendant, he was asked if he had "unlawfully kill[ed] and slay[ed] one Ricky Cook." Objection to this question was immediately sustained, the question was in reference to an involuntary manslaughter conviction in which defendant killed Ricky Cook when he was driving a car without a license at a speed of up to 120 miles per hour while under the influence of alcohol, and the question was asked in good faith and conformed to the law of involuntary manslaughter.

**4. Criminal Law § 45.1— experimental evidence—properly excluded**

The trial court did not abuse its discretion in excluding a photograph illustrative of defendant's brother's testimony which was offered to impeach the testimony of two prosecution witnesses. The witnesses had testified that they had lived in an apartment over a building and that on the night of the murder they had observed cars similar to that occupied by defendant and his companions drive up in front of the building; that the area where the car stopped was well lighted; that there was at least one light on inside the car; that at least one of the windows in the car was down; that they could hear the occupants talking loudly in an argumentative tone; that one of the witnesses saw a passenger in the front seat shoot out the window; and that both witnesses saw

State v. Bondurant

the same person point a gun into the backseat and after several minutes heard another gunshot and saw the car speed away. Defendant sought to introduce evidence that, from the apartment window, the witnesses would have been unable to see a person sitting in the front seat of the automobile but the trial judge properly ruled that the evidence sought to be admitted had been developed by means of an experiment, and the findings of fact found to support his ruling were supported by the evidence offered on voir dire.

**5. Criminal Law § 102.10— jury argument—reference to prior convictions or criminal conduct—improper—not prejudicial**

Although a prosecutor improperly argued defendant's prior misdeeds for purposes other than mere impeachment in his argument to the jury, the remarks were not such that the trial judge was required to declare a mistrial *sua sponte* since each time defendant objected to the challenged remarks, the objections were sustained and the trial judge carefully instructed the jury that they were to consider the evidence of defendant's past behavior only as he would explain in his charge, and since the judge later gave a complete and accurate instruction relating to the jury's consideration of defendant's prior acts of misconduct.

**6. Criminal Law § 113.1— recapitulation of evidence by trial court—error immaterial**

In a prosecution for first degree murder where the trial court, in summarizing the evidence, stated that defendant said something to the effect that "You don't believe I'll kill you" rather than "You don't believe I'll shoot you," the error was not "plain error" mandating a new trial for defendant since how defendant commented was relatively immaterial in that the express desire to shoot someone in the context in which it was stated was synonymous with killing him.

**7. Homicide § 24.2— first degree murder—instruction regarding malice**

In a prosecution for first degree murder, the trial judge correctly instructed the jury that malice and unlawfulness are implied from an intentional shooting with a deadly weapon since there was no evidence in the case of the elements of heat of passion on sudden provocation or self-defense, and since even if an instructional error was committed, the first-degree murder verdict rendered any error harmless beyond a reasonable doubt.

**8. Criminal Law § 135.4— death case—proportionality review—sentence of death excessive and disproportionate**

In a prosecution for first degree murder, the death sentence imposed was disproportionate within the meaning of G.S. 15A-2000(c)(2) in that it did "not rise to the level of those murders in which [the Court] [has] approved the death sentence upon proportionality review." Defendant did not murder his victim while in the perpetration of another felony; defendant did not coldly calculate the commission of the crime for a long period of time; the murder was not torturous as in other death cases; there was substantial evidence indicating that defendant and his traveling companions were highly intoxicated; there was no motive for the killing; and immediately after defendant shot the victim, he exhibited a concern for the victim's life and remorse for his action

by directing the driver of the automobile to the hospital and by entering the hospital himself to seek medical assistance for the decedent. In no other capital case among those in our proportionality review did the defendant express concern for the victim's life or remorse for his action by attempting to secure immediate medical attention for the deceased.

APPEAL by defendant from *Smith, Judge,* at the 22 March 1982 Criminal Session of SURRY County Superior Court.

Defendant was arrested on 6 April 1981 pursuant to a warrant charging the first-degree murder of Michael Roby Reynolds. On 29 June 1981, defendant was indicted for this crime by the Surry County grand jury. Defendant entered a plea of not guilty to the offense charged.

At trial, the State offered evidence tending to show that on the night of 5 April 1981, defendant was drinking beer and shooting pool at Tilley's Grocery in Mount Airy, North Carolina. Defendant called his stepson, Randy Hawks, to come to Tilley's and take him home. As defendant and Hawks prepared to leave the store, they met some friends of defendant, Monty Vernon, Mark Snow and the deceased, Michael Roby Reynolds. The five of them had a brief discussion and decided to ride around together and drink beer. Hawks agreed to drive the group in his automobile.

After they had driven around for a short while, defendant directed Hawks to Mayberry Paint and Wallpaper, defendant's place of employment. Defendant Bondurant and Monty Vernon went inside the store and returned a few minutes later with two guns, a .22 caliber pistol and a .45 caliber revolver. Defendant and Vernon then joined the others in the car and they continued to drive around and drink beer.

The group next stopped at the Snack Shack in Mount Airy. Defendant and Vernon went in to have a drink while the others remained in the car, listening to the radio. Defendant unsuccessfully attempted to sell the guns to several of the patrons and, shortly thereafter, he and Vernon rejoined the group outside. Defendant climbed into the front seat with his stepson, while Vernon rode in the back with Snow and Reynolds. Defendant carried the two weapons in the front with him, along with a shotgun he had earlier purchased at Tilley's Grocery.

Randy Hawks then drove the group to the Cupboard Number 5 on Highway 89. After Hawks pulled into the parking lot, defendant rolled down the window on the passenger side of the car and fired the .22 caliber pistol into the air several times. Mark Snow testified that following this action by defendant, Reynolds asked if they could go home because he had to get up early for work the next morning. After the decedent spoke about going home, defendant reached for the .45 caliber revolver, turned to Reynolds in the back seat and pointed the gun at his head. Vernon, Hawks and Snow each testified that defendant pointed the weapon at Reynolds for at least two minutes. Vernon further recalled that defendant taunted the victim by saying, "You don't believe I'll shoot you, do you?" Everyone in the car begged defendant not to shoot Reynolds, but defendant ignored their protestations and fired the weapon, shooting the victim in the head.

Defendant then turned and directed his stepson to Northern Hospital of Surry County. While enroute to the emergency room, defendant pointed the gun at Mark Snow for "two or three minutes" and asked him what he would say when they got to the hospital.

Upon arrival at the hospital, defendant went in to seek medical assistance for Reynolds. When he returned with the hospital attendants who removed the victim from the car, defendant told Hawks and Vernon to go wash the blood out of the car and to throw the guns away. Hawks and Vernon complied with defendant's demands. Defendant then reentered the hospital and talked with several police officers regarding the incident. Defendant told each of them that the shooting was an accident. The officers testified that none of the occupants of the car, including defendant, appeared to be drunk or under the influence of alcohol.

Finally, the State presented the testimony of several witnesses which tended to show that defendant had a violent and quick temper with a history of shooting into objects. Their testimony also revealed that defendant had a history of alcohol abuse which tended to aggravate his outbursts of temper.

Defendant's evidence, which included his own testimony, revealed that he planned to attend the automobile races in North Wilkesboro on 5 April 1981. Since the races were postponed due to rainy weather, defendant and a friend, Sonny Montgomery, de-

cided to spend the afternoon riding around Surry County and parts of Virginia. Before leaving on the trip, defendant purchased several cartons of beer at Tilley's Grocery. Montgomery had three bottles of whiskey in the truck. Defendant testified that while they drove around, he drank all of the beer and part of Montgomery's liquor.

Late in the afternoon, Montgomery drove to his home and defendant came inside with him. Montgomery's wife and daughter testified that defendant was very drunk. Defendant stayed at Montgomery's house for a short while talking and then Montgomery took him to Tilley's Grocery where he met Vernon, Snow and Reynolds.

Defendant's evidence is consistent with that presented by the State regarding Hawks' arrival to take defendant home, the agreement among the five of them to ride around drinking beer and the stops they made during the trip. Defendant's evidence differs, however, as to what occurred in the parking lot at the Cupboard Number 5.

Defendant admitted that after Hawks drove the car into the parking lot and turned off the ignition, he picked up the .22 caliber pistol and fired it out the window several times. Defendant testified that he then retrieved the .45 caliber revolver and, as he started to shoot it out the window, he heard someone in the back seat say something to him. He stated that as he turned around to respond, the gun accidentally discharged, shooting Reynolds in the head.

Several witnesses for defendant testified that they saw Vernon, Snow and Reynolds on the night of 5 April and that each of these men was under the influence of alcohol. Several other witnesses stated that they observed defendant both before and after the shooting and that he was highly intoxicated.

The jury returned a verdict of guilty of first-degree murder.

A sentencing hearing was held pursuant to G.S. 15A-2000 *et seq.*, following the first-degree murder conviction.

The State presented no evidence during the sentencing phase of the trial, electing to rely on its evidence presented during the guilt determination phase.

Defendant presented the testimony of several relatives, including his wife, Claudine Bondurant. The essence of their testimony was that defendant had a drinking problem; that he was kind to his family, visiting with them often; and that he had a good relationship with his children. Maggie Poore, defendant's employer, testified as to defendant's excellent work habits and described him as a dependable employee.

The trial court submitted two aggravating circumstances:

1. Was this murder especially heinous, atrocious or cruel?

2. Was this murder part of a course of conduct in which Robert Carlman Bondurant engaged and did that course of conduct include the commission by the defendant of other crimes of violence against another person or other persons?

The trial court submitted the following mitigating circumstances:

1. Does Robert Carlman Bondurant have no significant history of prior criminal activity?

2. Was the capacity of Robert Carlman Bondurant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law impaired?

3. Was Robert Carlman Bondurant married to Claudine Bondurant and:

   a. Was he a good husband which you deem to have mitigating value?

   b. Was he a good provider which you deem to have mitigating value?

4. Was Robert Carlman Bondurant the father of Shannon or Jeff Bondurant or both and:

   a. Did he have a good relationship with either or both of them which you deem to have mitigating value?

   b. Did he frequently visit with either or both of them which you deem to have mitigating value?

5. Was Robert Carlman Bondurant employed on the 5th day of April, 1981, which you deem to have mitigating value?

6. Did Robert Carlman Bondurant help his family on the farm as he was growing up which you deem to have mitigating value?

7. Has Robert Carlman Bondurant been a hardworking individual during his life which you deem to have mitigating value?

8. Did Robert Carlman Bondurant acquire:

a. a high school diploma or the equivalent thereof which you deem to have mitigating value?

b. two years of education at a community college which you deem to have mitigating value?

9. Has Robert Carlman Bondurant expressed remorse for the death of Michael Roby Reynolds which you deem has mitigating value?

10. Did Robert Carlman Bondurant, after the shooting of Michael Roby Reynolds:

a. Direct Randy Hawks to the hospital which you deem to have mitigating value?

b. Seek medical assistance at the hospital for Michael Roby Reynolds which you deem to have mitigating value?

11. Has Robert Carlman Bondurant been a loving and kind brother to his sisters and brothers which you deem to have mitigating value?

12. Was Robert Carlman Bondurant cooperative with law enforcement officers after the shooting of Michael Roby Reynolds which you deem to have mitigating value?

13. Do you find any other circumstance or circumstances which you deem to have mitigating value?

The jury found beyond a reasonable doubt that both aggravating circumstances existed and that these were sufficiently substantial to call for the imposition of the death penalty. The jury also found the existence of three mitigating circumstances: that defendant sought medical assistance for his victim, that he cooperated with law enforcement officers and, under number 13, that since the event of 5 April 1981, defendant had shown con-

sideration and respect toward his stepson. The jury specifically rejected the mitigating circumstances of impaired capacity and lack of significant prior criminal activity. They also found that defendant's education, work habits and relationship to his family had no mitigating value. Finally, the jury found beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances and recommended that defendant be sentenced to death.

The trial court sentenced defendant to die for the first-degree murder of Michael Roby Reynolds and defendant appealed his death sentence directly to this Court pursuant to G.S. 7A-27(a).

*Rufus L. Edmisten, Attorney General, by Charles M. Hensey, Assistant Attorney General, for the State.*

*Stephen G. Royster and Michael F. Royster for defendant appellant.*

BRANCH, Chief Justice.

### Guilt-Innocence Phase

By his first assignment of error, defendant contends that by death qualifying the jury and excluding for cause those who expressed opposition to the death penalty, the trial court violated his rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Defendant concedes the decided cases are against him and presents no arguments in support of his position that were not carefully considered by this Court in *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803 (1980); *State v. Davis*, 305 N.C. 400, 290 S.E. 2d 574 (1982); and *State v. Ladd*, 308 N.C. 272, 302 S.E. 2d 164 (1983). This contention is without merit.

[1] Defendant further argues that the trial judge erred in denying his pretrial motion concerning the manner in which the jurors should have been selected. Defendant's motion reads as follows, in pertinent part:

that jurors who may be opposed to capital punishment be allowed to sit . . . during the guilt or innocence phase of . . . [the] trial . . .; and, further, that the State and defendant be

permitted to pick an alternate juror who is not opposed to capital punishment to take the place of the juror who is opposed to capital punishment to sit as a juror during the sentencing phase of . . . [the] trial.

We hold that the trial judge correctly refused to permit jury selection in accordance with the method proposed by defendant. Selecting a jury composed both of those opposed and unopposed to capital punishment for the purpose of determining guilt and then, at the sentencing phase, replacing those opposed by alternates who are unopposed to the death penalty contravenes G.S. 15A-2000(a)(2), which contemplates that the same jury which determines guilt will recommend the sentence. General Statute 15A-2000(a)(2) permits alternate jurors to serve during the sentencing phase in extraordinary circumstances involving the death, incapacitation or disqualification of an empaneled juror, but does not provide for the exchange of jurors for the sentencing phase based upon their convictions concerning the death penalty. This assignment is overruled.

[2]  Defendant next contends that the trial judge erred in denying his motion to dismiss at the close of the State's evidence and at the close of all the evidence. He argues that there was not sufficient evidence of premeditation and deliberation to carry the case to the jury on the charge of first-degree murder.

When defendant elected to offer evidence on his own behalf at trial, he thereby waived his right to assert as error on appeal the denial of his motion for dismissal made at the close of the State's evidence. G.S. 15-173. We therefore consider only his motion to dismiss made at the close of all the evidence.

In considering this assignment of error, we apply the familiar rule that upon a motion for dismissal, all the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *State v. Thomas,* 296 N.C. 236, 250 S.E. 2d 204 (1978); *State v. Snead,* 295 N.C. 615, 247 S.E. 2d 893 (1978). When so considered, if there is substantial evidence to support a finding that the offense has been committed and the defendant was the perpetrator of the offense, the motion to dismiss should be denied. *State v. Cutler,* 271 N.C. 379, 156 S.E. 2d 679 (1967).

Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation. *State v. Thomas, supra.* Premeditation has been defined as "thought beforehand for some length of time no matter how short," while deliberation is "an intention to kill executed by the defendant in a 'cool state of blood' in furtherance of a 'fixed design to gratify a feeling of revenge or, to accomplish some unlawful purpose.'" *State v. Calloway,* 305 N.C. 747, 751, 291 S.E. 2d 622, 625 (1982).

When considered in the light most favorable to the State, the evidence in the instant case reveals that after firing the .22 caliber pistol, defendant retrieved the .45 caliber revolver and turned to point it at Reynolds' head. There is no evidence that the decedent provoked this menacing gesture in any way. Monty Vernon testified that defendant said to the victim, "You don't believe I'll shoot you, do you?" Each occupant of the car stated that defendant held the gun on the decedent for at least two minutes and that they were begging him not to shoot. Unmindful of their pleadings, defendant shot Reynolds in the head. The State presented evidence that the .45 caliber revolver was a "single action" type; that to fire the weapon the hammer had to be pulled back and set and the trigger pulled.

We hold that there was plenary and substantial evidence from which the jury could infer that defendant acted with premeditation and deliberation when he shot and killed Michael Roby Reynolds. The trial court properly denied defendant's motion to dismiss.

[3] Defendant next assigns as error the trial court's denial of his motion for mistrial following the district attorney's first question to him on cross-examination.

Defendant took the witness stand and testified extensively on his own behalf. On cross-examination, he was asked: "Mr. Bondurant, on May 30, 1968, did you unlawfully kill and slay one Ricky Cook?" Objection to this question was immediately sustained and a motion for mistrial denied. Defendant was then asked: "Mr. Bondurant, on the 13th day of January, 1970, were you charged and convicted of involuntary manslaughter?" Defendant replied: "Yes sir; as a result of a car accident." Defendant further admitted that on the evening that he struck and killed Ricky

Cook, he was driving the car without a license at speeds up to 120 miles per hour while under the influence of alcohol.

Defendant's argument is that the first question implied that he had been convicted of voluntary manslaughter as opposed to involuntary manslaughter. We do not agree.

Involuntary manslaughter is the unlawful and unintentional killing of another human being without malice and which proximately results from (1) an unlawful act not amounting to a felony nor naturally dangerous to human life, or (2) a culpably negligent act or omission. *State v. Redfern*, 291 N.C. 319, 230 S.E. 2d 152 (1976).

The first question posited to defendant was ". . . did you unlawfully kill and slay one Ricky Cook?" The prosecutor's emphasis was on the *unlawfulness* of defendant's act and unlawfulness is clearly an element of the crime for which defendant had been convicted. Contrary to defendant's contention, the question did not suggest an intentional act and thereby imply that defendant had been convicted of voluntary manslaughter.

Since the prosecutor's question was, by defendant's own admission, asked in good faith and since the question conformed to the law of involuntary manslaughter, we hold that the trial judge did not abuse his discretion in denying defendant's motion for mistrial.

[4] We next consider defendant's contention that the trial judge erred in excluding certain testimony of Clark Bondurant and in excluding a photograph illustrative of his testimony.

The challenged evidence was offered to impeach the testimony of two prosecution witnesses, Helen Dianne Bowman and Fern Tate. These two women testified, in substance, that on 5 April 1981, they lived in an apartment over The Cupboard Number 5 in Bannertown, near Mount Airy, North Carolina. Their testimony was that sometime after 11:00 p.m. on 5 April, they observed a car similar to that occupied by defendant and his companions drive up in front of The Cupboard between the gas pumps. Each remembered that the area where the car stopped was well lighted and that there was at least one light on inside the car. They also recalled that at least one of the windows in the car was down and that they could hear the occupants talking

loudly in an argumentative tone. Ms. Tate testified that she saw the passenger in the front seat shoot out the window. Both Ms. Tate and Ms. Bowman saw the same person point a gun into the back seat. After several minutes, they heard another gunshot and saw the car speed away. They copied down the license number of the automobile and Ms. Tate called the police to report the incident.

In order to impeach the testimony of Ms. Bowman and Ms. Tate, defendant sought to introduce testimony of his brother, Clark Bondurant. Several days prior to trial, Clark, defendant's wife, defense counsel and a photographer drove the car in which the group was riding on the night of the shooting to The Cupboard Number 5. They parked the automobile between the gas pumps in front of the building and took photographs of the car from ground level and from the apartment above. At trial, defense counsel asked Clark Bondurant to describe what he saw from the apartment window. The prosecution objected and a *voir dire* was held. Clark testified on *voir dire* that from the apartment window, he was unable to see a person sitting in the front seat of the automobile. He further stated that he was unable to see the object which the person in the front seat was holding, a broom handle intended to approximate the length of the gun held by defendant on the night of 5 April.

Following the *voir dire*, the trial judge ruled that the evidence sought to be admitted had been developed by means of an experiment. He further ruled that the conditions under which the experiment was conducted were too dissimilar from those existing on 5 April 1981 to permit the admission of Clark Bondurant's testimony and a photograph taken from the apartment.

Defendant first argues that the viewing of the inside of the car from the apartment window was not an experiment and that the trial judge erred by considering it in that context.

Resolution of this argument requires little discussion. An experiment is simply a restaging of past events in which significant conditions are artificially reproduced and results observed. 1 Brandis, North Carolina Evidence § 94 (2d rev. ed. 1982).

The procedure conducted by Clark Bondurant and others was an admitted attempt to recreate the scene observed by Ms. Bow-

man and Ms. Tate on the night of 5 April. Furthermore, the viewing was made in an obvious effort to discredit the testimony of the two women by showing that Clark was unable to see what they described from the same vantage point. Clearly, the trial judge correctly denominated the viewing an experiment.

Defendant further argues that even if the procedure is appropriately considered an experiment, the testimony regarding the viewing should have been admitted because the experiment was conducted under conditions substantially similar to those existing on 5 April 1981.

We note that the trial judge is commonly afforded broad discretion in determining whether the conditions and circumstances of an experiment are sufficiently similar to those sought to be duplicated to render the results admissible. *State v. Carter*, 282 N.C. 297, 192 S.E. 2d 279 (1972).

After hearing the *voir dire* evidence, the trial judge made findings of fact and entered conclusions of law as follows:

1. That defendant's exhibits 1, 2, and 3 are all photographs taken in the daylight hours at Cupboard No. 5, and the events of April 5, 1981, at Cupboard Number 5, as described by the witnesses, occurred during the evening hours and during darkness.

2. That the vehicle depicted in defendant's exhibits 1, 2 and 3 is in approximately the same location as it was on April 5, 1981, when the events occurred giving rise to this trial.

3. That on April 5, 1981, when the events occurred which gave rise to this trial, the interior lights of the car depicted in defendant's Exhibits 1, 2 and 3 were burning.

4. That at the time of the taking of defendant's Exhibits 1, 2 and 3, only one person was in the back seat of the vehicle depicted in said exhibits; and on the night of April 5, 1981, there were three persons in the back seat of the said vehicle.

Based on the foregoing findings the court concludes as follows:

1. That what might be seen through the rear window glass of the vehicle depicted in defendant's Exhibit Number 3 would

be increased by simply moving the vehicle depicted in said exhibit a slight distance.

2. That the angle of view from above the vehicle depicted in defendant's Exhibits 1, 2 and 3 would be greatly influenced by the height of an individual above the window sill, as would the view of the camera, and there has been no showing that the camera lens at the time of the taking of defendant's Exhibits 1, 2 and 3 approximated the height of the view of either the witness Dianne Bowman or Fern Tate.

3. That it is common knowledge and the court takes judicial notice that one's view into a darkened area from a lighted area is not the same as viewing from a darkened area or through a darkened area into a lighted area, the view of the latter being the better of the two.

4. That the height of the alleged pistol and its exact location in the vehicle would affect one's ability to view the same from above particularly when one considers that the location of the vehicle as shown in defendant's Exhibits 1, 2 and 3 is approximate.

5. That the conditions under which defendant's Exhibits 1, 2 and 3 were taken do not even approximate the conditions existing on April 5, 1981, as hereinabove concluded, and for that reason the same should not be admitted, nor should the same be admitted as indicating what the view from a window above the vehicle so depicted was on the night of April 5, 1981.

It is clear that the crucial findings of fact are supported by the evidence offered on *voir dire*. That evidence establishes only two circumstances that were ascertainably similar between the night in question and the staged recreation—the automobile and The Cupboard Number 5. The location of the car and viewers, the lighting conditions and the relative positions of the passengers and the weapon were not demonstrably similar.

We therefore hold that the trial judge did not abuse his discretion in excluding evidence of this experiment.

[5] Defendant contends that the trial judge erred in failing to declare a mistrial following improper jury arguments by the prosecutor.

The argument which forms the basis for defendant's first exception under this assignment of error was as follows: "Somebody somewhere said that the best way to tell the future is to look in the past, particularly when you are talking about human beings. You look at their past conduct and you can pretty well tell what their future is going to be." Defense counsel's objection was immediately sustained, a motion to strike allowed and the court instructed the jury to disregard the remarks and to consider evidence of defendant's past deeds only as the judge would later explain in his charge.

The following argument forms the basis of defendant's second exception: "And you put that with, 'You don't believe I'll shoot you' and you put that with a man with a record like he's got of shooting into cars, a truck, shooting into a floorboard, shooting into the side of the wall and the ceiling and shooting the window lights out—" Again defendant's objection was sustained and a cautionary instruction given. Defendant did not make a motion for mistrial after either argument.

While it is proper to refer to evidence of prior acts of misconduct in the arguments on the issue of credibility, we agree with defendant that the prosecutor here improperly argued defendant's prior misdeeds for purposes other than mere impeachment. The district attorney was, it seems, attempting to use these prior acts as substantive evidence of defendant's guilt.

Conceding the impropriety of the prosecutor's arguments, we must determine whether the remarks were such that the trial judge was required to declare a mistrial *sua sponte.*

In a capital case, the trial judge may order a mistrial only with the consent of the defendant unless such a ruling is necessary to attain the ends of justice. *State v. McKenna,* 289 N.C. 668, 224 S.E. 2d 537, *death sentence vacated,* 429 U.S. 912 (1976). It is our conclusion that such an order was not required in this case.

Each time defendant objected to the challenged remarks, the objections were sustained and the trial judge carefully instructed the jury that they were to consider the evidence of defendant's past behavior only as he would explain in his charge. The judge then later gave a complete and accurate instruction relating to the jury's consideration of defendant's prior acts of misconduct.

We hold that the district attorney's remarks did not constitute prejudice to defendant such that the trial judge was required to declare a mistrial on his own motion.

[6] Defendant's sixth assignment of error relates to a misstatement by the trial judge during his recapitulation of the State's evidence. The trial court summarized a portion of the evidence as follows: "That the defendant then took a .45 caliber Ruger pistol, that he pointed it at Michael Roby Reynolds and said something to the effect that, 'You don't believe I'll kill you.'" Prosecution witness Monty Vernon had actually testified that while defendant pointed the pistol at the victim's head, he heard defendant say: "You don't believe I'll *shoot* you, do you?" (emphasis added).

Defendant argues that the trial judge's substitution of the word "kill" for "shoot" suggested to the jury that defendant was guilty of premeditated murder.

Defendant concedes that he did not object to the trial judge's summation of the evidence and that when invited to offer corrections to the instructions given, he failed to bring this misstatement to the court's attention. Defendant argues, however, that this single deviation from the evidence presented constitutes "plain error" entitling him to a new trial.

"In deciding whether a defect in the jury instruction constitutes 'plain error,' the appellate court must examine the entire record and determine if the instructional error had a probable impact on the jury's finding of guilt." *State v. Odom*, 307 N.C. 655, 661, 300 S.E. 2d 375, 378-79 (1983). Even when the "plain error" rule is applied, "[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *Odom* at 661, 300 S.E. 2d at 378, *quoting Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

In the instant case, a review of the whole record reveals no "plain error" mandating a new trial for defendant. The uncontroverted evidence is that defendant pointed a .45 caliber revolver at Reynolds' face, cocked it, and held it on the victim for at least two minutes before firing. Whether defendant commented, "You don't believe I'll shoot you" or "You don't believe I'll kill you" is relatively immaterial. The expressed desire to shoot someone in this context is synonymous with killing them. We simply

do not believe the trial judge's misstatement connoted a premeditated intent to kill any more than the use of the word "shoot" would have under the factual circumstances of this case. This assignment is dismissed.

[7] Defendant next contends that the trial judge erred in his instruction to the jury that malice and unlawfulness are implied from an intentional shooting with a deadly weapon. Defendant bases this contention on the fact that there was some evidence of the absence of malice and unlawfulness, as evidenced by the trial court's instructions on voluntary and involuntary manslaughter.

We agree with defendant that when there is some evidence justifying an instruction concerning self-defense or heat of passion killing upon sudden provocation, any presumption of malice arising from a finding that defendant intentionally inflicted the wounds with a deadly weapon disappears, leaving only a permissible inference which the jury may accept or reject. *State v. Hankerson*, 288 N.C. 632, 220 S.E. 2d 575 (1975), *reversed on other grounds*, 432 U.S. 233 (1977). "The State is not required to prove malice and unlawfulness unless there is some evidence of their non-existence, but once such evidence is presented, the State must prove these elements beyond a reasonable doubt." *State v. Simpson*, 303 N.C. 439, 451, 279 S.E. 2d 542, 550 (1981).

We conclude that the trial judge correctly instructed the jury on the presumption of malice arising from the intentional use of a deadly weapon. We reach this conclusion because our careful review of the entire record reveals no evidence negating the existence of malice and justifying the manslaughter instructions given.

There were no claims of self-defense or heat of passion raised by defendant during the trial and, in fact, no evidence to support such claims. Defendant's theory of the case was that he accidentally shot the victim and the trial judge carefully and correctly instructed that the burden was on the State to disprove, beyond a reasonable doubt, defendant's assertion of accidental death.

Furthermore, any possible error placing the burden upon defendant to show absence of malice was cured by the jury's verdict of murder in the first degree.

In *State v. Bush*, 307 N.C. 152, 297 S.E. 2d 563 (1982), we held that when a defendant is convicted of premeditated and deliberate murder in the first degree, the State has not relied upon a mere presumption of malice. In finding a defendant guilty beyond a reasonable doubt of a willful, deliberate and premeditated killing, the jury has necessarily rejected beyond a reasonable doubt the possibility that the defendant acted in self-defense or in the heat of passion. *See Street v. Warden*, 423 F. Supp. 611 (D. Md. 1976), *aff'd*, 549 F. 2d 799 (4th Cir. 1976) (unpublished opinion), *cert. denied*, 431 U.S. 906 (1977); *Wilkins v. Maryland*, 402 F. Supp. 76 (D. Md. 1975), *aff'd*, 538 F. 2d 327 (4th Cir. 1976) (unpublished opinion), *cert. denied*, 429 U.S. 1044 (1977).

We hold that the trial judge did not err in his instructions to the jury with regard to the presumption of malice arising from an intentional killing with a deadly weapon, since there was no evidence in the case of the elements of heat of passion on sudden provocation or self-defense. Even assuming, *arguendo*, that the instructional error contended by defendant was committed, the first-degree murder verdict rendered any error harmless beyond a reasonable doubt. This assignment of error is overruled.

Finally, defendant argues that the trial judge erred in denying his motion to set aside the verdict as being against the greater weight of the evidence.

Motions to set aside the verdict are addressed to the discretion of the trial court and refusal to grant the motion is not reviewable on appeal in the absence of abuse of discretion. *State v. Boykin*, 298 N.C. 687, 259 S.E. 2d 883 (1979), *cert. denied*, 446 U.S. 911 (1980). If there is sufficient evidence to support the verdict, then the trial judge has acted within his discretion in denying the motion. *State v. Leigh*, 278 N.C. 243, 179 S.E. 2d 708 (1971).

Based upon our earlier reviews of the evidence, we conclude that there was sufficient evidence to support the verdict of first-degree murder and therefore no abuse of discretion has been shown. This assignment of error is without merit.

## Sentencing Phase

Defendant has raised numerous assignments of error relating to the sentencing phase of the trial. We have carefully reviewed each of them and find them to be without merit.

[8] We do not discuss defendant's various contentions, however, because in conducting our proportionality review as required by G.S. 15A-2000(d)(2), we find that the sentence of death is excessive and disproportionate to the penalty imposed in similar cases considering both the crime and the defendant.

As a final matter in every capital case, we are directed by G.S. 15A-2000(d)(2) to review the record and determine (1) whether the record supports the jury's findings of any aggravating circumstance or circumstances upon which the sentencing court based its sentence of death, (2) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor, and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

After an exhaustive review of the transcript, record on appeal, briefs and oral arguments, we have concluded that the evidence supports the aggravating factors found by the jury. We also conclude that the record is devoid of evidence indicating that the sentence may have been imposed under the influence of passion, prejudice or any other arbitrary factor. We thus turn to our final statutory duty of proportionality review.

In *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, --- U.S. ---, 104 S.Ct. 202 (1983), we established that

> [i]n comparing "similar cases" for purposes of proportionality review, we use as a pool for comparison purposes *all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

308 N.C. at 79, 301 S.E. 2d at 355. In describing the methods this Court will employ in making our comparisons, we further stated in *Williams* that

> this Court will not necessarily feel bound during its proportionality review to give a citation to every case in the pool of "similar cases" used for comparison . . . . The Bar may safely assume that we are aware of our own opinions filed in capital cases arising since the effective date of our capital punishment statute, 1 June 1977.

308 N.C. at 81-82, 301 S.E. 2d at 356.

After reviewing the approximately 65 life sentence cases and 13 death sentence cases in the proportionality pool, we find that although the crime committed by this defendant was a senseless, unprovoked killing, "it does not rise to the level of those murders in which we have approved the death sentence upon proportionality review." *State v. Jackson,* 309 N.C. 26, 46, 305 S.E. 2d 703, 717 (1983).

In the instant case, defendant did not murder Michael Roby Reynolds while in the perpetration of another felony. *Cf. State v. Craig & Anthony,* 308 N.C. 446, 302 S.E. 2d 740 (1983); *State v. Smith,* 305 N.C. 691, 292 S.E. 2d 264, *cert. denied,* --- U.S. ---, 103 S.Ct. 474 (1982); *State v. Taylor,* 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied,* --- U.S. ---, 103 S.Ct. 3552 (1983); *State v. Rook,* 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied,* 455 U.S. 1038 (1982). The facts further demonstrate that defendant did not coldly calculate the commission of this crime for a long period of time as did the defendant in *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied,* 448 U.S. 907, *rehearing denied,* 448 U.S. 918 (1980). This is evidenced by defendant's attempt to sell the gun which he used to kill the victim shortly before the killing. Finally, the record in this case does not reveal a torturous murder of the sort perpetrated by the defendants in *State v. Williams,* 308 N.C. 47, 301 S.E. 2d 335, *cert. denied,* --- U.S. ---, 104 S.Ct. 202 (1983); *State v. Brown,* 306 N.C. 151, 293 S.E. 2d 569, *cert. denied,* --- U.S. ---, 103 S.Ct. 503 (1982); and *State v. McDowell,* 301 N.C. 279, 271 S.E. 2d 286 (1980), *cert. denied,* 450 U.S. 1025 (1981).

There was substantial evidence presented at trial which indicated that defendant and his traveling companions were highly

intoxicated on the evening of 5 April 1981. There appears to have been no motive for the killing; defendant was among friends and up until the incident at The Cupboard Number 5, he behaved amiably toward the other passengers in the car.

We deem it important in amelioration of defendant's senseless act that immediately after he shot the victim, he exhibited a concern for Reynolds' life and remorse for his action by directing the driver of the automobile to the hospital. Defendant himself entered the hospital to seek medical assistance for the decedent. In no other capital case among those in our proportionality pool did the defendant express concern for the victim's life or remorse for his action by attempting to secure immediate medical attention for the deceased.[1] *E.g., State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, --- U.S. ---, 103 S.Ct. 474 (1982), *rehearing denied*, 103 S.Ct. 839 (1983). Finally, we note that defendant readily spoke with policemen at the hospital, confessing that he fired the shot which killed Michael Reynolds but explaining that the shooting was accidental.

Considering both the crime and the defendant, we hold as a matter of law that the death sentence imposed in this case is disproportionate within the meaning of G.S. 15A-2000(d)(2). We are therefore required by the statute to sentence defendant to life imprisonment in lieu of the death sentence.

By this action, we intend no criticism of the able trial judge. The proportionality review is a duty vested solely in this Court by statute.

The sentence of death is vacated and defendant is hereby sentenced to imprisonment in the State's prison for the remainder of his natural life. Defendant is entitled to credit for days spent in confinement prior to the date of this judgment.

---

1. By emphasizing this particular factor in mitigation of defendant's act, we do not mean to imply that this factor is determinative of our proportionality consideration. In conducting our proportionality review, we will consider the totality of the circumstances presented in each individual case and the presence or absence of a particular factor will not necessarily be controlling.

Guilt-Innocence Phase: No error;

Sentencing Phase: Death sentence vacated, sentence of life imprisonment imposed.