STATE OF NORTH CAROLINA v. MARCUS DECARLOS MITCHELL

No. 217A99

(Filed 6 April 2001)

**1. Jury— selection—capital trial—challenge for cause— reservations about death penalty**

The trial court did not abuse its discretion during jury selection for a capital first-degree murder prosecution by excusing for cause three prospective jurors who expressed general reservations about their ability to impose the death penalty under the reasonable doubt standard of proof.

**2. Jury— selection—capital trial—reference to separate sentencing jury**

The trial court did not err during jury selection in a first-degree murder prosecution by referring to the possibility that the separate sentencing proceeding could be before a different jury. The better practice would be for the trial court to make no mention of a different jury at the preliminary stage of the trial; however, the comment in this case was made before jury selection during the court's explanation of the manner in which the trial would be conducted and did not impermissibly dilute the jury's responsibility. The jurors knew they had been death qualified and had no reason to believe they would not be making the sentencing recommendation if defendant were found guilty of first-degree murder.

**3. Jury— selection—capital trial—Bible teachings**

The trial court did not abuse its discretion during jury selection for a capital first-degree murder prosecution by not allowing defendant to ask a potential juror about her understanding of the Bible's teachings on the death penalty after she had stated that she followed what the Bible said about the death penalty. The court permitted defendant to inquire into her religious affiliation, her views on capital punishment, her ability to consider mitigating circumstances, her willingness to impose a sentence of life imprisonment, and whether any teachings of her church would interfere with her ability to perform her duties as a juror.

**4. Jury— selection—capital trial—stake-out questions**

The trial court did not abuse its discretion during jury selection for a first-degree murder prosecution by not allowing

defendant to ask a potential juror questions which were an attempt to determine the kind of mitigating circumstances that would be sufficient to outweigh aggravating circumstances not yet in evidence.

**5. Jury— selection—capital trial—religious beliefs**

The trial court did not abuse its discretion during jury selection for a first-degree murder prosecution by not allowing defendant to ask whether God's law addresses aggravating and mitigating circumstances after the potential juror stated that she believed that capital punishment was not outlawed because Jesus had accepted capital punishment. Defendant was permitted to inquire into her religious affiliation, views on capital punishment, ability to consider mitigating circumstances, willingness to impose a life sentence, and whether her religious beliefs concerning accountability and blame would interfere with her ability to perform her duties as a juror. Moreover, the questions were an attempt to determine the verdict the potential juror would render under certain circumstances not yet in evidence and amounted to an improper stakeout.

**6. Jury— selection—capital trial—challenge for cause—rehabilitation—impasse between defendant and counsel**

The trial court did not err during a first-degree murder prosecution by excusing a prospective juror for cause and honoring defendant's personal decision not to attempt rehabilitation where the court properly found that defendant and his counsel had reached an absolute impasse over the tactical decision of whether to attempt to rehabilitate the prospective juror, defense counsel made a proper record of the circumstances, and defendant was fully informed and understood the potential consequences of his actions.

**7. Criminal Law— prosecutor's argument—defense attorney's belief in defendant's guilt**

The trial court did not err by not intervening ex mero motu in a prosecutor's closing argument in a first-degree murder prosecution where defendant contended that the prosecutor implied that even defendant's own attorneys believed him guilty, but the prosecutor's comment merely highlighted the defense strategy of creating holes in the State's case rather than arguing innocence. Rather than implying that defense counsel believed defendant to be guilty, the comment pointed out the defense

STATE v. MITCHELL

[353 N.C. 309 (2001)]

strategy and argued that there was no reason to doubt the State's investigation.

**8. Criminal Law— prosecutor's argument—defendant's objection to evidence**

The trial court did not err in a first-degree murder prosecution by not intervening ex mero moto in the prosecutor's argument concerning the connection of the murder weapon to defendant. Although defendant argued on appeal that the prosecutor's contention was that defendant admitted guilt by objecting to the admission of certain evidence, thus penalizing him for objecting to an unconstitutional search, defendant could have reminded the jury that he withdrew his objection to the evidence. Furthermore, the evidence connecting defendant to the weapon was overwhelming.

**9. Criminal Law— prosecutor's argument—defendant's failure to testify**

The trial court did not err in a first-degree murder prosecution by not intervening ex mero motu in the prosecutor's argument concerning defendant's failure to testify. The prosecutor's slightly veiled, indirect comment on defendant's failure to testify was harmless beyond a reasonable doubt. However, it was noted that prosecutors have a duty as officers of the court and as advocates for the people to conduct trials in accordance with due process and the fair administration of justice and should thus refrain from arguments that unnecessarily risk being violative of a defendant's fundamental constitutional rights.

**10. Confessions and Other Incriminating Statements— Miranda warnings—not stale**

The trial court did not err by denying a first-degree murder defendant's motion to suppress his statements to sheriff's investigators where defendant was read his Miranda rights at approximately 9:00 a.m.; waived those rights at 10:00 a.m.; confessed at approximately 12:00 p.m. to an unrelated robbery; questioning resumed after lunch at 2:30 p.m.; and defendant confessed to these murders at about 3:30 p.m. Although defendant contended that the original Miranda warnings had grown stale, the N.C. Supreme Court considered the totality of the circumstances, including the factors in *State v. McZorn*, 288 N.C. 417, and was not persuaded that the initial warnings were so remote as to create a substantial possibility that

defendant was unaware of his constitutional rights at the time of his second confession.

**11. Homicide— first-degree murder—short-form indictments**

The short-form first-degree murder indictments are constitutional.

**12. Sentencing— death—proportionate**

Sentences of death for three first-degree murders were proportionate where the record supports the aggravating circumstances found by the jury, there was no suggestion that the sentences were imposed under the influence of passion, prejudice, or any other arbitrary consideration and, given the astonishingly callous disregard for human life evidenced by defendant's actions resulting in multiple murders, the present case is more similar to cases in which death was found proportionate than to those in which it was found disproportionate or to those in which juries have consistently returned recommendations of life imprisonment.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing sentences of death entered by Allen (J.B., Jr.), J., on 4 November 1997 in Superior Court, Wake County, upon a jury verdict finding defendant guilty of three counts of first-degree murder. Heard in the Supreme Court 14 February 2001.

*Roy A. Cooper, Attorney General, by G. Patrick Murphy, Special Deputy Attorney General, for the State.*

*Staples Hughes, Appellate Defender, by Mark D. Montgomery, Assistant Appellate Defender, for defendant-appellant.*

PARKER, Justice.

Defendant Marcus DeCarlos Mitchell was indicted on 1 April 1997 for three counts of first-degree murder in the killing of victims Dameon Armstrong, Dewayne Rogers, and Robin Watkins. Defendant was tried capitally and found guilty of all three counts of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. Following a capital sentencing proceeding, the jury recommended a sentence of death for each murder conviction; and the trial court entered judgments accordingly.

The State's evidence tended to show that defendant, along with Antonio Mitchell, Durron Ray, and Tildren Hunter, drove to Rogers'

STATE v. MITCHELL

[353 N.C. 309 (2001)]

home in Zebulon, North Carolina, on the night of 3 March 1997 to steal firearms. Defendant, Mitchell, Ray, and Hunter were each dressed in black and wearing ski masks and gloves. Defendant had a .45-caliber handgun in his possession, while Hunter carried a .40-caliber handgun, and Ray carried a .380-caliber handgun.

Once the group arrived near Rogers' home, Mitchell remained in the car while defendant, Ray, and Hunter approached the house. Defendant knocked on the door, and Ray and Hunter hid from view. When Armstrong, a fourteen-year-old boy, answered the door, defendant pulled him onto the porch. Ray and Hunter came out from their hiding places, and defendant directed Hunter to kick in the door of the house. Defendant and Hunter then entered the house, and Ray stayed on the porch with Armstrong.

Defendant discovered Rogers and Watkins in a bathroom as he and Hunter were searching the house for firearms. Defendant forced Rogers and Watkins to lie on the floor in the living room. Defendant and Hunter then forced Armstrong to assist them in searching for firearms. At the conclusion of the search, Armstrong was brought into the living room and forced to lie on the floor with Rogers and Watkins.

After taking the keys to Watkins' car, defendant indicated to Ray and Hunter that they should kill the victims. Ray took Armstrong to the back of the house while defendant stayed in the living room and shot Rogers and Watkins. Immediately after defendant shot Rogers and Watkins, Ray shot Armstrong five times. Defendant, Ray, and Hunter then took Watkins' car and drove to the location where Mitchell was waiting with the getaway car. Defendant, Ray, and Hunter got into the car with Mitchell. After taking Mitchell home, defendant, Ray, and Hunter drove to Raleigh, North Carolina.

Meanwhile, Armstrong's uncle, Gabriel Miles, heard the gunshots from his nearby home and went to investigate. Once inside Rogers' house, Miles discovered the bodies of Rogers, Watkins, and Armstrong. Miles then called 911 from a neighbor's home.

On 8 March 1997 Raleigh police officers searched a hotel room occupied by defendant. The officers discovered a money bag, two walkie-talkies, several "hoodies" or items that may be worn over the top of the head and pulled down over the face, several gloves, a .380-caliber Lorcin handgun, and a .45-caliber Ruger handgun. Officers found a .40-caliber Smith and Wesson handgun in another room in the

same hotel. The State's ballistics expert later matched the bullets that killed Watkins and Rogers and the shell casings in the living room to the .45-caliber Ruger handgun found in defendant's hotel room. The ballistics expert also matched the bullets that killed Armstrong and the shell casings in the back bedroom to the .380-caliber Lorcin handgun found in defendant's hotel room. Investigators from the Wake County Sheriff's Department questioned defendant later that day, and defendant confessed to shooting Rogers and Watkins.

The pathologist who performed the autopsies on the victims determined that Watkins and Rogers each died from a gunshot wound to the back of the head. The pathologist found that Armstrong suffered gunshot wounds to the chest, head, buttocks, back, and right knee. The bullet wound to Armstrong's chest penetrated his lung and caused massive hemorrhaging that would have caused the victim to lose consciousness in two to five minutes. The chest wound caused Armstrong's death within two to ten minutes.

Additional facts will be presented as needed to discuss specific issues.

## JURY SELECTION

[1] In his first assignment of error, defendant contends that the trial court erred in excusing for cause prospective jurors Ann Cole, Mark Perisich, and Marlene Lombardo. The test for determining when a juror may be excused for cause is whether his or her views "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)). The decision as to whether a juror's views would prevent or substantially impair the performance of the juror's duties is within the trial court's broad discretion. *See State v. Gregory*, 340 N.C. 365, 394, 459 S.E.2d 638, 655 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996). The fact that a prospective juror "voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction" is not sufficient to support an excusal for cause. *Witherspoon v. Illinois*, 391 U.S. 510, 522, 20 L. Ed. 2d 776, 785 (1968). Here, defendant maintains that the excusal of prospective jurors Cole, Perisich, and Lombardo violated the standard in *Wainwright* in that these prospective jurors expressed general reservations about their ability to impose the death penalty under the reasonable doubt standard of proof. Defendant further argues that appli-

cation of the "beyond a reasonable doubt" standard is subjective with each juror. We disagree.

First, prospective juror Cole testified that she was opposed to the death penalty in most, but not all, cases. Cole further testified that she would require the State to satisfy a higher burden than beyond a reasonable doubt before she would recommend the death sentence. The prosecutor then asked clarifying questions, and Cole unequivocally stated that she could follow the law during the sentencing proceeding and that her views of the death penalty would not substantially impair her ability to serve as a juror. However, in response to additional questioning from the prosecutor, defendant, and the trial court, Cole consistently stated that she would require a higher standard of proof than beyond a reasonable doubt and that she would apply her standard of proof during the sentencing proceeding. On this record defendant has failed to demonstrate that the trial court abused its discretion in concluding that prospective juror Cole's views would prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and her oath.

Second, prospective juror Perisich testified that, while he was not opposed to the death penalty as a general principle, he was unsure about his ability to recommend the death sentence. Perisich explained that the thought of imposing the death penalty gave him "a sick feeling" and that he was concerned about the long-term effects on him of recommending the death penalty. In response to the prosecutor's questions, Perisich stated that his views on the death penalty would impair his ability to perform his duties as a juror and that he would require a higher standard of proof than reasonable doubt during the sentencing proceeding. The trial court then asked some additional questions; and Perisich ultimately stated that he would not impose the death penalty unless he was "absolutely, positively sure" that defendant committed the murder. On this record we cannot conclude that the trial court abused its discretion in allowing the State's challenge for cause as to prospective juror Perisich.

Finally, prospective juror Lombardo initially indicated that she could consider both possible punishments, life imprisonment or the death penalty, and that she did not have strong feelings about the death penalty. However, after the prosecutor explained the capital sentencing process, Lombardo expressed reservations about the finality of the death sentence; and Lombardo testified that her concerns about the possibility that defendant was innocent might sub-

stantially impair her ability to perform her duties as a juror during the sentencing proceeding. The trial court asked some additional questions, Lombardo indicated that she would always vote for life imprisonment, and defendant declined the opportunity to attempt to rehabilitate Lombardo. On this record defendant has again failed to demonstrate an abuse of the trial court's discretion in allowing the State's challenge for cause as to prospective juror Lombardo. This assignment of error is, therefore, overruled.

[2] Defendant next assigns error to the trial court's informing prospective jurors during *voir dire* that a separate jury might be impaneled for the sentencing proceeding. Defendant argues that the trial court's misleading reference to the possibility of a separate sentencing jury violated his rights under the Eighth Amendment to the Constitution of the United States by diluting the responsibility of the jury. *See Caldwell v. Mississippi*, 472 U.S. 320, 328-29, 86 L. Ed. 2d 231, 239 (1985). We disagree.

Before jury selection began, the trial court in its remarks orienting the prospective jurors as to procedure made the following statement:

[I]n the event that the Defendant is convicted of murder in the first degree, the Court will conduct a separate sentencing proceeding to determine whether the Defendant should be sentenced to death or life imprisonment without parole.

This proceeding may be conducted before the trial jury or another jury. It will be conducted, if necessary, as soon as practical after the verdict of first degree murder is returned.

Following this statement, the trial court explained the capital sentencing process and the jury's duty to find and weigh aggravating and mitigating circumstances. The trial court then proceeded with jury selection, which included death-qualifying questions from the prosecutor.

Defendant's reliance on cases in which this Court has found error where a prosecutor's argument suggested that the jury's decision would be reviewed by an appellate court is misplaced. *See State v. Jones*, 296 N.C. 495, 251 S.E.2d 425 (1979); *State v. White*, 286 N.C. 395, 211 S.E.2d 445 (1975).

N.C.G.S. § 15A-2000(a)(2) provides that the capital sentencing proceeding "shall be conducted by the trial judge before the trial jury

as soon as practicable after the guilty verdict is returned." N.C.G.S. § 15A-2000(a)(2) (1999). Only if the trial jury which determined guilt is unable to reconvene for a hearing on sentencing shall a new jury be impaneled to determine the issue of punishment. *See id.* The better practice, therefore, would be for the trial court to make no mention of a different jury at the preliminary stage of the trial.

However, in this case the trial court's brief comment, made before jury selection and during the trial court's explanation of the manner in which the trial would be conducted, did not impermissibly dilute the jury's responsibility by implying that another jury would be impaneled for defendant's sentencing proceeding. The main thrust of the trial court's comments was to inform the jury that in the event defendant was convicted of first-degree murder, a separate sentencing proceeding would be conducted and that defendant would face the possibility of the death penalty. Immediately after the trial court's reference to the possibility of a separate sentencing jury, the trial court fully explained the capital sentencing proceeding to the prospective jurors; and later, the prosecutor extensively questioned the jurors about their views on the death penalty. The jurors knew they had been death qualified and had no reason to believe they would not be making the sentencing recommendation if defendant were found guilty of first-degree murder. Thus, in context, the trial court's statement did not mislead the jury or relieve the jury of its responsibility. This assignment of error is overruled.

[3] In his next assignment of error, defendant asserts that the trial court abused its discretion during *voir dire* by not allowing him to ask several prospective jurors about their ability to consider mitigating evidence. Defendant contends that he should have been permitted the opportunity to explore the jurors' religious beliefs or willingness to consider certain types of mitigating evidence. Defendant argues that his questions were permissible under *Morgan v. Illinois*, 504 U.S. 719, 733, 119 L. Ed. 2d 492, 505 (1992), in that the questions "inquired into whether a juror could be fair and impartial and whether predetermined views regarding the death penalty would substantially impair that prospective juror's ability to serve." *State v. Kandies*, 342 N.C. 419, 441, 467 S.E.2d 67, 79, *cert. denied*, 519 U.S. 894, 136 L. Ed. 2d 167 (1996). After a careful review of the transcript of *voir dire*, we find this assignment of error to be without merit.

First, prospective juror Linda Phillips testified that she could consider any mitigating circumstances presented, that she could con-

sider the punishment of life imprisonment, and that she could follow the law. Defendant then asked Phillips about her religious beliefs; and Phillips explained that, as a Free Will Baptist, she followed what the Bible said about the death penalty. Defendant attempted to ask Phillips about her understanding of the Bible's teachings on the death penalty. However, the prosecutor objected to defendant's question; and the trial court sustained the prosecutor's objection. Defendant subsequently exercised a peremptory challenge to remove Phillips.

In *State v. Laws*, 325 N.C. 81, 109, 381 S.E.2d 609, 625-26 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), this Court held that the trial court did not abuse its discretion by sustaining the State's objection when the defendant asked a prospective juror whether she believed in a literal interpretation of the Bible. The Court noted that the defendant was given wide latitude to question prospective jurors about their beliefs, attitudes, and biases. *Id.* However, the Court emphasized that "[c]ounsel's right to inquire into the beliefs of prospective jurors to determine their biases and attitudes does not extend to all aspects of the jurors' private lives or of their religious beliefs." *Id.* at 109, 381 S.E.2d at 625.

Similarly, in this case the trial court permitted defendant to inquire into prospective juror Phillips' religious affiliation, views on capital punishment, ability to consider mitigating circumstances, and willingness to impose a sentence of life imprisonment. Defendant also asked Phillips whether any teachings of her church would interfere with her ability to perform her duties as a juror. Phillips gave unequivocal answers to each of defendant's questions indicating that she could follow the law. Thus, defendant was given wide latitude to inquire into Phillips' beliefs, attitudes, and biases; and defendant has not shown any abuse of discretion in the trial court's ruling on this one particular question.

[4] Second, defendant explained mitigating circumstances to prospective juror Dr. Rick Phillips, mentioned several types of evidence that might be submitted as mitigating circumstances, and then asked the following question:

With three murder charges facing him, if the State is able to prove to you that [defendant] did each and every one of them, killed three separate individual people in cold blood premeditatedly deliberately intended the result and killed all three people intending that result, would you be able to consider fairly things like

sociological background, the way that he grew up, if he had an alcoholic problem, things like that in weighing whether or not he should get the death penalty or whether or not he should get life without parole.

The prosecutor objected, and the trial court sustained the objection. Defendant then asked Dr. Phillips whether he could consider whatever evidence the trial court might submit as mitigating circumstances, and Dr. Phillips indicated that he could consider mitigating evidence. Defendant immediately attempted to ask Dr. Phillips the following question:

Assuming that the State proves that [defendant] committed three murders cold blooded first degree premeditated deliberate murders, can you conceive in your own mind the mitigating factors that would let you find your ability for a penalty less than death.

The prosecutor objected again, and the trial court sustained the objection. Defendant subsequently exercised a peremptory challenge to remove Dr. Phillips.

"Counsel should not fish for answers to legal questions before the judge has instructed the juror on applicable legal principles by which the juror should be guided. . . . Jurors should not be asked what kind of verdict they would render under certain named circumstances." *State v. Phillips*, 300 N.C. 678, 682, 268 S.E.2d 452, 455 (1980); *see also State v. Braxton*, 352 N.C. 158, 179, 531 S.E.2d 428, 440 (2000), *cert. denied*, —— U.S. ——, —— L. Ed. 2d —— (Jan. 22, 2001) (No. 00-7359); *State v. Robinson*, 339 N.C. 263, 273, 451 S.E.2d 196, 202 (1994), *cert. denied*, 515 U.S. 1135, 132 L. Ed. 2d 818 (1995). The questions posed in this case do not amount to a proper inquiry into whether the juror could follow the law as instructed by the trial judge. *See Robinson*, 339 N.C. at 273, 451 S.E.2d at 202. Rather, the questions are an attempt to determine what kind of mitigating evidence would be sufficient to outweigh aggravating circumstances not yet in evidence if defendant were convicted of three counts of first-degree murder based on premeditation and deliberation. *See Braxton*, 352 N.C. at 179, 531 S.E.2d at 440; *State v. Skipper*, 337 N.C. 1, 23, 446 S.E.2d 252, 264 (1994), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995). We have previously held that "staking out" what the jurors' decision will be under a particular set of facts is improper. *See Braxton*, 352 N.C. at 179, 531 S.E.2d at 440; *State v. Simpson*, 341 N.C. 316, 336, 462 S.E.2d 191, 202 (1995), *cert. denied*,

**STATE v. MITCHELL**

[353 N.C. 309 (2001)]

516 U.S. 1161, 134 L. Ed. 2d 194 (1996). Thus, defendant has not shown any abuse of discretion in the trial court's rulings as to prospective juror Phillips.

[5] Finally, prospective juror Billie Whitfield stated that she believed capital punishment was not outlawed because Jesus had accepted capital punishment. Defendant asked Whitfield the following question:

So if the State of North Carolina were to prove to you beyond a reasonable doubt that [defendant] was guilty of first degree cold blooded premeditated murder with aggravating circumstances, would your feelings about the death penalty be so strong in that instance that you would not be able to consider mitigating circumstances.

The prosecutor objected to defendant's question, and the trial court instructed defendant to explain "the whole law" before asking such detailed questions. Defendant then explained mitigating circumstances to prospective juror Whitfield, mentioned several types of evidence that might be submitted to show mitigation, and asked whether she could consider whatever evidence might be submitted to support mitigating circumstances. Whitfield responded as follows:

I guess that I believe that we each are accountable for what we do and we cannot point our finger to blame someone else for our decisions, the way that we are today.

The trial court then asked some clarifying questions, and Whitfield indicated that she could consider mitigating circumstances in determining whether life imprisonment or the death penalty was the appropriate punishment. Defendant resumed questioning Whitfield as follows:

[DEFENDANT]: Okay. If there is a difference between what . . . God's law is and what the State's law is to you, can you follow the State's law.

JUROR: I do not believe that the State's law is going to be different.

[DEFENDANT]: Well, the State's law specifically says to address aggravating and mitigating circumstances.

JUROR: Yes.

[DEFENDANT]:  Okay. And you understand that.

JUROR:  Yes.

[DEFENDANT]:  And is it your belief that God's law also addresses aggravating and mitigating circumstances.

The prosecutor objected to defendant's question, and the trial court sustained the prosecutor's objection. Defendant continued questioning Whitfield, and the following exchange occurred:

[DEFENDANT]:  In view of your religious beliefs can you follow the State's law as to the instructions on capital punishment.

JUROR:  I have not been faced with that question before.

[DEFENDANT]:  Well, of course not.

JUROR:  And—

[DEFENDANT]:  I do not mean to be—

JUROR:  If the aggravating circumstances or evidence is so strong, today, not knowing anything about anything here, I believe that I would have to—the aggravating circumstance would be so strong, the mitigating circumstances, would not carry that kind of staying power in my beliefs.

[DEFENDANT]:  If the State were to prove to you first degree murder, cold blooded premeditated deliberated first degree murder beyond a reasonable doubt and then prove to you the first part of the sentencing phase beyond a reasonable doubt the existence of aggravating circumstance, are you then saying that the mitigating circumstance . . . would have to be so strong as to outweigh that.

[PROSECUTOR]:  Objection.

THE COURT:  Sustained, and I do not believe that she said that. I will let you repeat the exact law and see if she can follow the law.

[DEFENDANT]:  Going back to that question—in my earlier questions, on some of these matters—I promise you there will not be many more.

If the State were to prove to you, as I said, a cold blooded premeditated first degree murder, all three counts of this, and then to

prove to you that there were beyond a reasonable doubt the existence of aggravating circumstance[s], would you be able to consider as mitigating circumstances such things as—

The prosecutor objected to defendant's question, and the trial court sustained the prosecutor's objection. Defendant subsequently exercised a peremptory challenge to remove Whitfield.

As stated earlier, "[c]ounsel's right to inquire into the beliefs of prospective jurors to determine their biases and attitudes does not extend to all aspects of the jurors' private lives or of their religious beliefs." *Laws*, 325 N.C. at 109, 381 S.E.2d at 625. Here, the trial court permitted defendant to inquire into prospective juror Whitfield's religious affiliation, views on capital punishment, ability to consider mitigating circumstances, and willingness to impose a sentence of life imprisonment. Defendant also asked Whitfield whether her religious beliefs concerning accountability and blame would interfere with her ability to perform her duties as a juror. Whitfield gave unequivocal answers to each of defendant's questions indicating that she could follow the law. Thus, defendant was given wide latitude to inquire into Whitfield's beliefs, attitudes, and biases; and defendant has not shown any abuse of discretion in the trial court's ruling on the question about whether God's law addresses aggravating and mitigating circumstances.

Similarly, as stated earlier, "[j]urors should not be asked what kind of verdict they would render under certain named circumstances." *Phillips*, 300 N.C. at 682, 268 S.E.2d at 455. Here, the questions posed to Whitfield about mitigating circumstances do not amount to a proper inquiry into whether the juror could follow the law as instructed by the trial judge. *See Robinson*, 339 N.C. at 273, 451 S.E.2d at 202. Rather, the questions were an attempt to determine what kind of verdict Whitfield would render under certain circumstances not yet in evidence. *See Braxton*, 352 N.C. at 179, 531 S.E.2d at 440. Thus, defendant's questions amount to improper "stake out" questions; the trial court permitted defendant wide latitude to inquire into Whitfield's ability to consider mitigating circumstances; and the trial court did not abuse its discretion by sustaining the prosecutor's objections. *See id.* This assignment of error is overruled.

[6] Next, defendant contends that the trial court erred in ordering defense counsel to defer to defendant's wishes not to rehabilitate prospective juror Mynawati Katwaru. We disagree.

Prospective juror Katwaru testified that she would decide the case based on emotional sympathy for the victims and, thus, would not be a fair and impartial juror. The trial court indicated that Katwaru could be removed for cause, and defense counsel conferred with defendant. Defense counsel subsequently informed the trial court that defendant, against counsel's advice, wanted to remove Katwaru for cause without any attempt to rehabilitate. The trial court inquired into defense counsel's position that rehabilitation questions might reveal that emotional mitigating evidence would persuade Katwaru to vote for life imprisonment, and the trial court discussed defense counsel's position with defendant. When defendant adamantly insisted that he wished to remove Katwaru for cause without additional questioning, the trial court questioned defendant on the record about his desire to remove Katwaru for cause against counsel's advice. The trial court then removed Katwaru for cause without permitting defense counsel an opportunity for rehabilitation.

In general, the responsibility for tactical decisions, such as which jurors to accept or strike, "rests ultimately with defense counsel." *State v. McDowell*, 329 N.C. 363, 384, 407 S.E.2d 200, 211 (1991). "However, when counsel and a fully informed criminal defendant client reach an absolute impasse as to such tactical decisions, the client's wishes must control; this rule is in accord with the principal-agent nature of the attorney-client relationship." *State v. Ali*, 329 N.C. 394, 404, 407 S.E.2d 183, 189 (1991). Further, when such impasses arise, defense counsel should make a record of the circumstances, the advice given to the defendant, the reasons for the advice, the defendant's decision, and the conclusion reached. *Id.*

After reviewing the transcript in this case of the discussion among the trial court, defendant, and defense counsel, we conclude that the trial court properly found that defendant and his counsel had reached an absolute impasse over the tactical decision of whether to attempt to rehabilitate prospective juror Katwaru. Defense counsel made a proper record of the circumstances, including their advice to defendant and the reasons for their decision to continue questioning Katwaru. From these statements of defense counsel and defendant's answers to questions directed to him by the trial court, we conclude that defendant was fully informed of and understood the potential consequences of his decision. Thus, we hold that the trial court did not err in excusing the prospective juror for cause and honoring defendant's personal decision not to attempt rehabilitation.

## GUILT-INNOCENCE PHASE

In his next assignment of error, defendant contends that the trial court committed error in failing to intervene *ex mero motu* at several points during the prosecution's closing argument. We disagree.

Where a defendant fails to object to the closing arguments at trial, defendant must establish that the remarks were so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu*. "To establish such an abuse, defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *State v. Davis*, 349 N.C. 1, 23, 506 S.E.2d 455, 467 (1998), *cert. denied*, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999). " '[T]he impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.' " *State v. Hipps*, 348 N.C. 377, 411, 501 S.E.2d 625, 645 (1998) (quoting *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979)), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 114 (1999).

[7] Here, following defense counsel's argument that the State's evidence was incomplete and lacked corroboration, the prosecutor stated:

> [Defense counsel] stood up here and talked to you for I don't know how many minutes. I wasn't timing him. I think the judge was. But not one time did he say to you that man's not guilty. He didn't tell you that. If you recall, he didn't say that. He talked about the investigation. He talked about why don't we have any fingerprints. If you wear stuff like this (indicating) and you rub something like that, you don't leave fingerprints. Don't be fooled by the question of the investigation. There's not one shred of evidence that [the investigating officer] has lied to you.

Defendant argues that this comment implied that even defendant's own attorneys believed he was guilty. However, the prosecutor's comment merely highlighted that defense counsel's strategy was to create holes in the State's case rather than to argue evidence of innocence. In light of that strategy, the prosecutor then argued that there was no reason to doubt the validity of the investigation. The comment did not imply that defense counsel believed defendant was guilty; rather, it pointed out defense counsel's strategy and urged that there was no

**STATE v. MITCHELL**

[353 N.C. 309 (2001)]

reason to doubt the State's method of investigation. Therefore, we decline to hold that this comment was so grossly improper as to warrant intervention *ex mero motu.*

[8] The prosecutor also referred to defendant's objection to the admission of some physical evidence, stating:

> [Defendant is] connected by this gun . . . being found in his room. . . . This is the murder weapon. And where was it found? [Defendant's hotel room]. No connection? No connection, [defendant]? It was found with [defendant's] driver's license and his identification cards that I passed to you. I didn't pass everything in that wallet, over the defendant's objection. He didn't want you to see this, obviously.

Defendant contends that the prosecutor improperly argued that defense counsel admitted guilt by objecting to the introduction of certain evidence. Defendant further asserts that, under *Mapp v. Ohio*, 367 U.S. 643, 6 L. Ed. 2d 1081 (1961), this argument burdened defendant's right to suppress evidence resulting from an unconstitutional search by penalizing defendant for making the objection.

Assuming *arguendo* that it was improper for the prosecutor to argue that evidence was admitted over defendant's objections in an effort to bolster the credibility and importance of that evidence, we conclude that this statement was not so grossly improper as to render defendant's trial fundamentally unfair and thereby warrant intervention *ex mero motu.* Defendant withdrew his objection to the admission of this evidence and could have so reminded the jury in his own closing argument. Furthermore, the evidence connecting defendant to the weapon was overwhelming in that defendant was in the room where authorities found the weapon; defendant was seen carrying a .45-caliber handgun at the time of the murders; and the ballistics testing revealed that the spent shells and casings found at the crime scene were fired from the .45-caliber Ruger handgun located in defendant's hotel room. In light of this evidence the alleged error, if any, was harmless beyond a reasonable doubt. Thus, we overrule this assignment of error.

[9] Finally, in concluding his closing argument, the prosecutor stated:

> We've given this man his day in court. That's part of our justice system. In this democracy we have a justice system and we say to [defendant], you have a right not to one lawyer, but two lawyers.

STATE v. MITCHELL

[353 N.C. 309 (2001)]

> He can say anything he wants to. He has a right to testify. And that's part of our jobs to do that. Whatever your feelings may be about that, for justice to be done, this is the way we do it. It's not a speedy process, sometimes. But what we're searching for is the truth.

Defendant contends that the prosecutor improperly commented on defendant's exercise of his constitutional right not to testify at trial.

A defendant has the right to refuse to testify under the Fifth Amendment to the United States Constitution, as incorporated by the Fourteenth Amendment, *see Griffin v. California*, 380 U.S. 609, 615, 14 L. Ed. 2d 106, 110 (1965), and under Article I, Section 23 of the North Carolina Constitution, *see State v. Reid*, 334 N.C. 551, 554, 434 S.E.2d 193, 196 (1993). A defendant's exercise of this right may not be used against him, and any reference by the State to a defendant's failure to testify violates that defendant's constitutional rights. *See State v. Baymon*, 336 N.C. 748, 758, 446 S.E.2d 1, 6 (1994). A statement that may be interpreted as commenting on a defendant's decision not to testify is improper if the jury would naturally and necessarily understand the statement to be a comment on the failure of the accused to testify. *See State v. Rouse*, 339 N.C. 59, 95-96, 451 S.E.2d 543, 563 (1994), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995). However, a prosecutor's reference to a defendant's failure to testify does not mandate an automatic reversal but requires the court to determine whether the error is harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b) (1999); *State v. Reid*, 334 N.C. at 557, 434 S.E.2d at 198.

Assuming *arguendo* that the prosecutor's comment in the present case was error, we conclude, in light of the overwhelming evidence of defendant's guilt, that the prosecutorial error and the trial court's failure to intervene *ex mero motu* were harmless beyond a reasonable doubt. *See State v. Autry*, 321 N.C. 392, 401, 364 S.E.2d 341, 347 (1988). In addition to defendant's confession as to his participation in the murders, the State presented the testimony of an accomplice corroborating defendant's involvement and evidence connecting defendant to the murder weapon. On this record the prosecutor's slightly veiled, indirect comment on defendant's failure to testify was harmless beyond a reasonable doubt. Finally, we note that district attorneys and assistant district attorneys have a duty as officers of the court and as advocates for the people to conduct trials in accordance with due process and the fair administration of justice and should

thus refrain from arguments that unnecessarily risk being violative of a defendant's fundamental constitutional rights, thereby necessitating new trials.

[10] By another assignment of error, defendant contends that the trial court erred in denying his motion to suppress statements he made to investigators from the Wake County Sheriff's Department. At the hearing on defendant's motion to suppress, the trial court made the following findings of fact: Defendant was read his *Miranda* rights at approximately 9:00 a.m. on 8 March 1997; and defendant knowingly, voluntarily, and understandingly signed a waiver of those rights at 10:00 a.m. that same morning. After questioning by Raleigh police officers, defendant confessed at approximately 12:00 p.m. to an unrelated robbery. Defendant was then provided with lunch, and an investigator from the Wake County Sheriff's Department began questioning defendant at 2:30 p.m. about these murders. At approximately 3:30 p.m. on 8 March 1997, defendant confessed to the murders. The trial court concluded that the original *Miranda* warnings given at 9:00 a.m. had not grown stale before the confession to the murders and denied defendant's motion to suppress the statement.

Defendant contends that the trial court erred in finding that the original *Miranda* warnings were not stale by the time of the second interrogation. Defendant asserts that a change in the subject matter of the interrogation should require fresh *Miranda* warnings under the United States and North Carolina Constitutions.

This Court must consider the totality of the circumstances in determining "whether the initial warnings have become so stale and remote that there is a substantial possibility the individual was unaware of his constitutional rights at the time of the subsequent interrogation." *State v. McZorn*, 288 N.C. 417, 434, 219 S.E.2d 201, 212 (1975), *death sentence vacated*, 428 U.S. 904, 49 L. Ed. 2d 1210 (1976); *see also State v. Smith*, 328 N.C. 99, 113, 400 S.E.2d 712, 719 (1991); *State v. Fisher*, 318 N.C. 512, 522-23, 350 S.E.2d 334, 340 (1986).

In reviewing the totality of circumstances, the following five factors, among others, should be considered:

(1) the length of time between the giving of the first warnings and the subsequent interrogation, (2) whether the warnings and the subsequent interrogation were given in the same or different places, (3) whether the warnings were given and the subsequent

interrogation conducted by the same or different officers, (4) the extent to which the subsequent statement differed from any previous statements, and (5) the apparent intellectual and emotional state of the suspect.

*McZorn*, 288 N.C. at 434, 219 S.E.2d at 212 (citations omitted).

Here, consideration of the *McZorn* factors weighs against a finding that the warnings had grown stale. First, the confession occurred only six and one-half hours after the warnings; and defendant was allowed rest-room breaks and a two and one-half hour lunch during that time. Second, the evidence shows that defendant was given his *Miranda* warnings and was interrogated in the exact same location. Third, the warnings were given and the subsequent interrogation was conducted by different officers, a fact which weighs in favor of defendant's position. Fourth, defendant's statement did not differ substantially from the initial statements. Shortly after the warnings were given, defendant confessed to the unrelated robbery while the warnings were fresh in his mind. Moreover, the murders were connected to another robbery. Hence, the likelihood that defendant had forgotten the *Miranda* warnings is *de minimis*. Fifth, the evidence does not suggest that defendant's intellectual or mental state would affect his awareness of his rights at the time of the second confession. Thus, considering the totality of the circumstances, including that four of the five *McZorn* factors weigh against defendant's position, this Court is unpersuaded that the initial warnings were so remote as to create a substantial possibility that defendant was unaware of his constitutional rights at the time of his second confession. This assignment of error is overruled.

[11] Defendant next contends that the short-form murder indictments authorized by N.C.G.S. § 15-144 and utilized in this case are unconstitutional under *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311 (1999), and *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435 (2000). Defendant argues that the indictments are unconstitutional for the following reasons: (i) the indictments do not allege the elements of first-degree murder that distinguish it from second-degree murder, (ii) there is no indication as to which theory of first-degree murder the grand jury found the evidence to support, (iii) the short form indictment statute violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and (iv) the indictments do not list aggravating circumstances. In light of *Jones* and *Apprendi*, this Court has recently held that the short-form indictment alleges all necessary elements of first-

degree murder, *State v. Holman*, 353 N.C. 174, 179, 540 S.E.2d 18, —— (2000); *State v. Golphin*, 352 N.C. 364, 395, 533 S.E.2d 168, 193 (2000); *Braxton*, 352 N.C. at 175, 531 S.E.2d at 438; is sufficient to indict on any theory of murder, *Braxton*, 352 N.C. at 174, 531 S.E.2d at 437; does not violate equal protection, *Holman*, 353 N.C. at 180, 540 S.E.2d at ——; and need not allege aggravating circumstances, *Holman*, 353 N.C. at 180, 540 S.E.2d at —— ; *Golphin*, 352 N.C. at 397, 533 S.E.2d at 193-94; *Braxton*, 352 N.C. at 175, 531 S.E.2d at 438. Defendant has neither advanced new arguments nor cited any new authority to persuade us to depart from these holdings. Therefore, this assignment of error is overruled.

## PRESERVATION ISSUES

Defendant raises one additional issue that he acknowledges has previously been decided contrary to his position by this Court, namely, whether the State's use of peremptory challenges to exclude jurors hesitant to impose the death penalty is unconstitutional.

Defendant raises this issue for purposes of urging this Court to reexamine its prior holdings and also for the purpose of preserving the issue for any possible further judicial review. We have considered defendant's arguments on this issue and find no compelling reason to depart from our prior holdings. This assignment of error is overruled.

## PROPORTIONALITY

[12] Finally, this Court has the exclusive statutory duty in capital cases to review the record and determine (i) whether the record supports the aggravating circumstances found by the jury; (ii) whether the death sentences were entered under the influence of passion, prejudice, or any other arbitrary factor; and (iii) whether the death sentences are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (1999). Having thoroughly reviewed the record, transcripts, and briefs in the present case, we conclude that the record fully supports the aggravating circumstances found by the jury in each of the three murder convictions. Further, we find no suggestion that the sentences of death were imposed under the influence of passion, prejudice, or any other arbitrary consideration. Accordingly, we turn to our final statutory duty of proportionality review.

The jury found defendant guilty of three counts of first-degree murder on the basis of premeditation and deliberation and under the

felony murder rule. At defendant's capital sentencing proceeding, the jury found the three aggravating circumstances submitted for the murders of Watkins and Armstrong: that defendant was previously convicted of a felony involving the threat of violence to the person, N.C.G.S. § 15A-2000(e)(3); that the murder was committed to avoid or prevent lawful arrest, N.C.G.S. § 15A-2000(e)(4); and that the murder was part of a course of conduct, including defendant's commission of other crimes of violence against other persons, N.C.G.S. § 15A-2000(e)(11). The jury found the two aggravating circumstances submitted for the murder of Rogers: that defendant was previously convicted of a felony involving the threat of violence to the person, N.C.G.S. § 15A-2000(e)(3), and that the murder was part of a course of conduct, including defendant's commission of other crimes of violence against other persons, N.C.G.S. § 15A-2000(e)(11).

One statutory mitigating circumstance was submitted and found as to each murder: defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was impaired, N.C.G.S. § 15A-2000(f)(6). As to each of the three murders, three statutory mitigating circumstances were submitted but not found: defendant had no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1); defendant's age at the time of the crime, N.C.G.S. § 15A-2000(f)(7); and the catchall, N.C.G.S. § 15A-2000(f)(9). An additional statutory mitigating circumstance as to the murder of Dameon Armstrong was submitted to but not found by the jury: defendant was an accomplice in the capital felony committed by another person, and his participation was relatively minor, N.C.G.S. § 15A-2000(f)(4). Finally, as to all three murders, the jury found both nonstatutory mitigating circumstances submitted and that they had mitigating value.

We begin our analysis by comparing this case to those cases in which this Court has determined the sentence of death to be disproportionate. We have determined the death penalty to be disproportionate on seven occasions. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). We conclude that

this case is not substantially similar to any case in which this Court has found the death penalty disproportionate.

Several characteristics in this case support the determination that the imposition of the death penalty was not disproportionate. Defendant was convicted of three counts of first-degree murder under the felony murder rule and on the basis of premeditation and deliberation. We have noted that "the finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Further, "[i]n none of the cases in which the death penalty was found to be disproportionate has the jury found the (e)(3) aggravating circumstance." *State v. Peterson*, 350 N.C. 518, 538, 516 S.E.2d 131, 143 (1999), *cert. denied*, 528 U.S. 1164, 145 L. Ed. 2d 1087 (2000). "The jury's finding of the prior conviction of a violent felony aggravating circumstance is significant in finding a death sentence proportionate." *State v. Lyons*, 343 N.C. 1, 27, 468 S.E.2d 204, 217, *cert. denied*, 519 U.S. 894, 136 L. Ed. 2d 167 (1996). Finally, defendant was convicted of three counts of first-degree murder. This Court has never found the death penalty disproportionate in a multiple-murder case. *See State v. Heatwole*, 344 N.C. 1, 30, 473 S.E.2d 310, 325 (1996), *cert. denied*, 520 U.S. 1122, 137 L. Ed. 2d 339 (1997).

In carrying out this statutory duty, we also consider cases in which this Court has found the death penalty proportionate; however, "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *State v. McCollum*, 334 N.C. 208, 244, 433 S.E.2d 144, 164 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). In this case one victim, Rogers, was in his home at night, a time and place this Court has taken into consideration in determining the appropriateness of the death penalty. Further, a second victim, Armstrong, was only fourteen-years-old and was shot five times while lying in a prone position after he had heard the shots which killed the other two victims. Given the astonishingly callous disregard for human life evidenced by defendant's actions resulting in these multiple murders, we conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence disproportionate or to those in which juries have consistently returned recommendations of life imprisonment.

We conclude, therefore, that defendant's death sentences were not excessive or disproportionate. We hold that defendant received a

fair trial and capital sentencing proceeding, free from prejudicial error. Accordingly, the judgments of death are left undisturbed.

NO ERROR.