STATE OF NORTH CAROLINA v. JIMMY McNEILL

No. 615A03

(Filed 27 January 2006)

**1. Appeal and Error— preservation of issues—failure to present argument—failure to cite authority**

Although defendant assigns multiple instances of error in the jury selection and guilt-innocence proceeding of a first-degree murder case including his conviction of discharging a firearm into occupied property, these assignments of error are abandoned because defendant has not presented any argument or cited any authority in support of these assignments.

**2. Sentencing— capital—aggravating circumstances—especially heinous, atrocious, or cruel murder**

The trial court did not err in a first-degree murder case by submitting the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance that the murder was especially heinous, atrocious, or cruel, because: (1) in determining the sufficiency of the evidence, the evidence is looked at as a whole and not in the piecemeal manner proposed by defendant; and (2) in this case, the victim pleaded for her life while defendant continued shooting her and he showed no mercy as she was prone on the ground, the murder was dehumanizing since defendant unloaded the capacity of his gun inflicting multiple gunshots upon his victim, defendant scarred for life the many witnesses to the murder including children, the victim was unable to retreat or flee as defendant began shooting her while she was confined to the passenger compartment of her vehicle, defendant continued to pursue the victim when she finally exited the vehicle, the victim knew she was going to die but could not do anything to prevent her impending death, and defendant kicked the victim in addition to shooting her on the very spot where her wedding ring would have been.

**3. Sentencing— capital—prosecutor's argument—aggravating circumstances—especially heinous, atrocious, or cruel murder**

The prosecutor's closing argument defining the especially heinous, atrocious, or cruel aggravating circumstance in a capital sentencing proceeding was not grossly improper so as to require the trial court to intervene ex mero motu where the

**STATE v. McNEILL**

[360 N.C. 231 (2006)]

prosecutor used the language of the first two paragraphs of the relevant pattern jury instruction but not the latter two paragraphs, and defense counsel failed to object to this language as incomplete or misleading, because the prosecutor's failure to recite the entire pattern instruction falls within the prosecutor's latitude and does not constitute gross error, especially in light of the preceding and subsequent arguments that fully explained this aggravating circumstance.

4. **Sentencing— capital—prosecutor's argument—aggravating circumstances—expecially heinous, atrocious, or cruel murder**

The trial court did not abuse its discretion by denying defendant's objection to the prosecutor's argument in a capital sentencing proceeding setting forth three types of murders that would warrant submission of the especially heinous, atrocious, or cruel aggravating circumstance where the prosecutor did not make an improper comparison between the murder at hand and murders previously found to be especially heinous, atrocious, or cruel, but instead merely aided the jury in its understanding of what the Supreme Court has held to be types of murders in which this aggravating circumstance could be found by tracing the language used in the Supreme Court opinions, and continued by showing how this murder fit within the parameters defined by the law.

5. **Sentencing— capital—defendant's closing argument— especially heinous, atrocious, and cruel aggravating circumstance—improper comparisons between cases and the fact of each case**

The trial court did not err in a first-degree murder case by sustaining the prosecution's objections during defendant's closing argument in the penalty proceeding even though defendant contends it prevented him from fully explaining to the jury the decision it was to make concerning the especially heinous, atrocious, and cruel aggravating circumstance, because: (1) the prosecution merely set out the law and applied the facts of the present case to the law whereas defendant began to make comparisons between cases and the fact of each case which our Supreme Court has not allowed; and (2) the circumstances of other murders either actual or imagined that defense counsel believed were more heinous, atrocious, or cruel were not present in the record at the time of closing arguments, and, therefore, counsel may not introduce such evidence in closing when there

was no request for the trial court to take judicial notice of the other murders referenced.

**6. Sentencing— capital—aggravating circumstances—murder especially heinous, atrocious, or cruel—not unconstitutionally vague and overbroad**

Although defendant contends the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance that the murder was especially heinous, atrocious, or cruel is unconstitutionally vague and overbroad, and that this purported vagueness cannot be cured by appellate narrowing on review after *Ring v. Arizona*, 536 U.S. 584 (2002), our Supreme Court recently discussed this issue at length in *State v. Duke*, 360 N.C. 110 (2005), and there is no compelling reason to overrule this precedent.

**7. Sentencing— capital—requested instruction to change language of Issue Three**

The trial court did not err in a capital sentencing proceeding by denying defendant's request to change the language in the jury instructions and the Issues and Recommendation as to Punishment form regarding Issue Three to state that the jury must recommend a sentence of life imprisonment unless it found the aggravating circumstances outweighed the mitigating circumstances, because: (1) the instruction proffered by defendant was an incorrect statement of the law articulated in N.C.G.S. § 15A-2000; and (2) contrary to defendant's assertion, the instruction as given did not impermissibly shift the burden as to Issue Three to defendant by creating a presumption of an affirmative answer when all of the elements required for a jury to make a binding recommendation of death must be proved by the State beyond a reasonable doubt.

**8. Constitutional Law— effective assistance of counsel—dismissal without prejudice**

Defendant's claim of ineffective assistance of counsel in a first-degree murder case is dismissed without prejudice because further inquiry is required into these allegations of ineffective assistance of counsel.

**9. Sentencing— capital—death penalty—proportionate**

The trial court did not err in a first-degree murder case by sentencing defendant to death and defendant's suggestion to suspend consideration of death penalty cases is declined, because:

**STATE v. McNEILL**

[360 N.C. 231 (2006)]

(1) defendant was convicted of first-degree murder based upon the felony murder rule and upon a theory of malice, premeditation, and deliberation; (2) the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance that the murder was especially heinous, atrocious, or cruel is sufficient, standing alone, to affirm the death sentence; and (3) defendant kicked his wife as he walked back to his pickup truck after firing every cartridge contained by his rifle, he made no attempt to apologize, no attempt to help her, nor did he check to see if she was still alive.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge Jack A. Thompson on 15 July 2003 in Superior Court, Scotland County, upon a jury verdict finding defendant guilty of first-degree murder. On 21 June 2004, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of an additional judgment. Heard in the Supreme Court 17 October 2005.

*Roy Cooper, Attorney General, by John H. Watters, Special Deputy Attorney General, for the State.*

*Paul M. Green for defendant-appellant.*

BRADY, Justice.

Defendant Jimmy McNeill murdered his wife, Shirley McNeill, at a friend's home in front of numerous witnesses, a number of them children, on 10 April 2000. On 29 January 2001, a Scotland County grand jury indicted defendant for the murder of Shirley McNeill and for discharging a weapon into occupied property. Defendant was tried capitally before a jury at the 23 June 2003 Criminal Session of the Scotland County Superior Court. On 11 July 2003, the jury found defendant guilty of first-degree murder on the basis of malice, premeditation, and deliberation and additionally under the felony murder rule. The jury also found defendant guilty of discharging a firearm into occupied property, a Class E felony. On 15 July 2003, following a capital sentencing proceeding, the jury returned a binding recommendation of death for the first-degree murder conviction, and the trial court entered judgment in accordance with that recommendation. Additionally, the trial court sentenced defendant, within the presumptive range, to a term of thirty-four to fifty months for discharging a firearm into occupied property.

Defendant appealed his convictions and sentence of death to this Court. After consideration of the assignments of error raised by

defendant on appeal and a thorough review of the transcript, the record on appeal, the briefs, and oral arguments, we find no reversible error in defendant's convictions or sentences.

## FACTUAL BACKGROUND

Defendant and Shirley McNeill were married in 1975, nearly twenty-five years before her murder. From the beginning, the marriage was a troubled one. By defendant's own admission, law enforcement officers were called to the marital home a number of times for domestic violence incidents prior to 10 April 2000. Defendant was convicted of assault on a female, an A1 misdemeanor, for an incident involving Shirley three years into their marriage. Defendant admitted to multiple incidents of uncharged domestic violence, one in which he poured food over his wife while she was asleep, and another incident in which he burned her clothes, "[b]ecause she was dating a man, I think." Approximately twenty years after the couple's marriage, the relationship further declined as both defendant and Shirley suffered the deaths of close family members. During this stressful time defendant substantially increased his consumption of alcohol and began smoking crack cocaine.

In early 2000, Shirley left the marital home and began residing with her niece, Yolanda Gates. Shirley retained an attorney to draft a separation agreement, claiming a separation date of 31 January 2000. By defendant's own admission, Shirley's move from the marital home caused him to "los[e] total control." This caused him to increase his consumption of alcohol and escalated his abuse of controlled substances. Additionally, he was plagued by sleep deprivation, loss of appetite, and a lethargic work ethic. Sometime in late February of 2000, Shirley began a romantic relationship with Vernon "Bun" McDougald, Shirley's supervisor and an early childhood acquaintance of defendant. When defendant learned of the adulterous relationship it completely "devastated" him. In his own words, "It ate me up. Just totally ate me up every day, day in and day out. Night and day." Defendant's obsessive behavior towards Shirley reflected his loss of control. Defendant telephoned her incessantly and showed up at locations where he believed she would be. On many occasions, defendant followed her to and from work. Additionally, defendant discussed his marital problems with several of his friends and acquaintances. For instance, he told his longtime friend Danny Monroe if Shirley didn't come back, there's no telling what he might do. Further, Defendant told Shirley's first cousin, Jerome Swindell, "if [defendant] couldn't have her, nobody else going to have her [sic]."

During the days leading up to Shirley McNeill's murder, defendant's obsessive behavior intensified. At approximately 7:45 a.m. on Friday, 7 April 2000, defendant entered the parking lot at Burlington Industries Raeford Plant, where Shirley was employed. Glenn McCutcheon, a security guard at Burlington Industries, observed defendant looking in the windows of Shirley's vehicle and then entering the vehicle. As defendant left the parking lot, McCutcheon approached defendant and inquired if he needed help, to which defendant replied that he came to see his wife. Defendant then departed the premises.

On Saturday, 8 April 2000, two days before the murder, defendant went to Yolonda Gates's residence, where Shirley was living. His purported purpose was to visit with Shirley's grandson Tyler McRae. During the visit, defendant continually prodded Shirley to come home with him, but she refused. After defendant returned home, he attempted to telephone Shirley, but Gates answered the telephone call and lied at Shirley's direction, telling defendant Shirley was not at the residence. Nevertheless, defendant continued to telephone throughout the night until Gates finally removed the phone from its cradle at 1:00 a.m., which prevented anyone from telephoning her. At Shirley's request, Gates relocated Shirley's car behind a neighbor's house so defendant could not observe it if he drove past. Approximately thirty to forty-five minutes later, defendant drove to Gates's residence, even driving into her yard and driveway. The next morning, as soon as Gates returned the phone to its cradle, defendant's telephoning resumed. Just like the night before, Gates continued to tell defendant Shirley was not there.

On Sunday, 9 April 2000, the day before her murder, Shirley attended services at Nazareth Baptist Church and a church social afterwards. Jerome Swindell, Shirley's first cousin, testified he was in the church parking lot during the social when defendant drove into the parking lot in the company of Johnny "Jail" Morrison. Swindell invited them to join the festivities, but defendant declined. Swindell later advised Shirley defendant had been there. Shirley subsequently asked Ronnie Livingston, her brother-in-law, to take Tyler to his father's residence in Fayetteville, and Livingston did so, using Shirley's car for the trip. Livingston and Tyler, accompanied by Carlton Gates, Shirley's brother, arrived at Tyler's father's residence in Fayetteville to find defendant sitting in his pickup truck, backed up near a fence at the property. When Livingston escorted Tyler into the residence, defendant departed the area. Livingston then returned the

vehicle to Shirley, advising her defendant had been waiting at Tyler's father's residence. When Shirley returned to Gates's residence, she parked her car behind a neighbor's house so defendant would not know she was there.

## DAY OF THE HOMICIDE

On the morning of Monday, 10 April 2000, the day of her murder, Shirley McNeill drove to the residence of Carolyn McLeod, her best friend for over forty years. Both McLeod and Shirley were employed by Burlington Industries Raeford Plant for over twenty-six years and they often carpooled to work. Shirley arrived at McLeod's residence at about 7:20 a.m. As McLeod walked out to Shirley's vehicle, defendant drove up next to Shirley. Defendant told Shirley he was going to kill her that afternoon. Shirley and McLeod then drove to Burlington Industries. On the way, McLeod recommended Shirley take defendant's threat seriously and suggested she not drive McLeod home that afternoon alone. Shirley indicated she did not take defendant's threat seriously. Vernon "Bun" McDougald, Shirley's paramour and supervisor, testified Shirley told him about defendant's threat while she was at work that day.

While Shirley and McLeod were at Burlington Industries, defendant spent the morning consuming alcohol and napping. According to defendant's testimony, he awoke around noon and went to an acquaintance's residence to try to obtain some crack cocaine. Because his acquaintance did not have any crack cocaine, defendant traveled to another friend's house and consumed more alcohol. Later, defendant went to Massey's Grocery and purchased a pint of Lightning Creek wine.

Danny Monroe, a friend of defendant's for fifteen to twenty years, testified he went to defendant's house at approximately 4:00 p.m. to ask if he could either rent or purchase a lawnmower trailer defendant owned. Defendant "kind of smiled, and he told [Monroe] that if he do [sic] what he's thinking about doing that [Monroe] could have it." Defendant then left his residence and drove towards Massey's Grocery. By his own admission, defendant parked his truck under the tree at Massey's Grocery knowing Shirley would pass by when she took McLeod home.

Shirley and McLeod left Burlington Industries at approximately 4:00 p.m., returning to McLeod's residence. While en route, they observed defendant's truck parked at Massey's, and Shirley stopped her vehicle next to where defendant was standing. Defendant walked up

to the driver's side of Shirley's car and asked, "Are you going to do what I told you to do?" Shirley asked, "What's that?" Defendant responded, "Are you going to come back home?" Shirley said, "No," and defendant said, "Well, that's all I wanted to know." Shirley replied, "Well, you said you were going to kill me this afternoon anyway."

Shirley continued traveling to McLeod's residence and parked her vehicle in the driveway. Almost immediately, defendant arrived and parked his truck behind Shirley's vehicle. Approximately six or seven neighborhood children were playing in the area as these events unfolded.

While McLeod exited the vehicle, defendant walked toward the driver's side of Shirley's vehicle with a rifle in his hand. He told McLeod to go in the house and he "wouldn't bother [her]." Without warning, Defendant shot Shirley in the chest through the driver's side window. Shirley pleaded with him not to shoot her again. McLeod testified she heard five or six more shots as she ran behind a nearby shed. All of the eyewitnesses observed defendant pursuing Shirley around the yard, shooting her multiple times. McLeod testified Shirley was begging, "Please, Jimmy, don't kill me. Please don't kill me." Defendant continued firing his rifle and began calling Shirley, her mother, and her sister vulgar names.

At some point, Shirley collapsed face down on the ground near the driver's side of her car. Defendant shot her approximately eight more times, still calling her and her family expletives. Veronica Blue, Shirley's cousin and one of McLeod's neighbors, observed Shirley attempting to escape by crawling on her arms even as defendant continued shooting her in the back. Both McLeod and Blue shouted at defendant to stop shooting, but defendant continued to fire until expending all sixteen of the cartridges his rifle held. As a final insult, defendant kicked Shirley and left her to die. Before the arrival of first responders to the scene, Shirley's wounds rendered her unconscious.

While witnesses sought help for Shirley, defendant left the scene in his pickup truck. Defendant drove his truck to the home of Eula Mae Rogers, the mother of defendant's friend, Will Rogers. Defendant asked to use the telephone, but apparently was not able to complete the call. When Eula Mae inquired as to whom he was trying to call, defendant responded, "I was trying to call the police. I just shot Shirley." Eula Mae noted there was no emotion in Defendant's voice as he relayed this information. Defendant then told her he was going

to return a lawnmower part which belonged to Will and which he had borrowed earlier. Eula Mae testified she saw him leave toward Will's house, but because Will was not home defendant departed.

Law enforcement personnel responded to the crime scene, and immediately enlisted other officers to aid in searching for and apprehending defendant. Soon thereafter, Officer Corey Jones of the Wagram Police Department and Detective Randy Jacobs of the Scotland County Sheriff's Department stopped defendant's vehicle near the police station in downtown Wagram. The officers ordered defendant out of his vehicle at gunpoint and handcuffed him. Law Enforcement Officers recovered the murder weapon in defendant's truck incident to his arrest. At one point during defendant's transport, Deputy Eric Pate smelled alcohol, and he asked defendant how much he had drunk, to which defendant responded, "I think it's best I keep my mouth shut."

At approximately 6:30 p.m., Agent Janie Pinkston of the North Carolina State Bureau of Investigation (SBI) interviewed defendant at the Scotland County Sheriff's Department. She solicited defendant's consent to search his pickup truck, which he declined. Therefore, Agent Pinkston applied for a search warrant for the vehicle, which was granted by the magistrate. Defendant made no statements to Agent Pinkston or any other law enforcement official about the circumstances of his wife's shooting. At approximately 8:45 p.m., Agent Pinkston informed defendant his wife had died. Agent Pinkston testified defendant "did not react. What I noted was no change in his physical appearance, and no change in his demeanor."

North Carolina Chief Medical Examiner John D. Butts, M.D. testified concerning the autopsy performed on Shirley's body by Michael Ross, M.D., which Dr. Butts supervised. The autopsy revealed sixteen gunshot wounds, including wounds to Shirley's shoulder, chest, back, hip, buttocks, thigh, foot, and forearm. Additionally, the autopsy report showed defendant shot Shirley's ring finger of her left hand at the very spot where her wedding ring would have been had she been wearing it at the time of her murder.

As to the cause of death, Dr. Butts testified that Shirley died as a result of multiple gunshot wounds. Her lungs, heart, liver, spleen, and both kidneys were damaged. Several of the gunshot wounds would have been irreversibly fatal, even if medical personnel had been at the scene when the shooting began. Due to the nature of Shirley's injuries, Dr. Butts was unable to determine the sequence of the gun-

STATE v. McNEILL

[360 N.C. 231 (2006)]

shot wounds, but he did indicate the location and trajectory of the wounds comported with the eyewitness testimony.

Through microscopic examination, an S.B.I. expert conclusively matched fifteen of the sixteen spent shell casings found at the crime scene to defendant's Marlin Model 60 .22 caliber semiautomatic rifle. Of the eleven projectile fragments recovered from Shirley's body during the autopsy, one fragment was also conclusively matched to defendant's firearm.

Based upon the above evidence, the jury convicted defendant of first-degree murder under both the felony murder rule and a theory of malice, premeditation, and deliberation, as well as a separate offense of discharging a firearm into occupied property.

## CAPITAL SENTENCING PROCEEDINGS

At the capital sentencing proceeding, the State presented victim impact evidence from Shirley's sister, Maizie Quick, and her mother, Esther McLeod. Defendant presented evidence from Jeffrey McKee, Ph.D., a forensic psychologist, that defendant was under the influence of emotional disturbance at the time of the murder, specifically due to alcohol and cocaine dependence. Dr. McKee's opinion was, at the time defendant murdered his wife, his capacity to conform his conduct to the requirements of the law was impaired. Defendant's aunts, Mary McNeill, Thelma Williams, and Janice Patricia Waddell, and his uncle by marriage, Artie Bethea, testified as character witnesses for defendant. They all testified to defendant's close relationship with his extended family. His aunts testified the deaths of defendant's close family members within such a short period of time affected him deeply. His uncle testified defendant's military service during Operation Desert Storm in the Middle East affected defendant negatively as well. Additionally, four stipulations were read to the jury concerning defendant's military service, high school graduation, and his public service.

The jury unanimously found beyond a reasonable doubt as an aggravating circumstance that the murder was especially heinous, atrocious, or cruel. One or more of the jurors found nine mitigating circumstances. The jury unanimously found beyond a reasonable doubt that the mitigating circumstances were insufficient to outweigh the aggravating circumstance. The jury also found unanimously and beyond a reasonable doubt the aggravating circumstance was sufficiently substantial to call for the imposition of

the death penalty when considered with the mitigating circumstances. The jury thereby returned a binding recommendation of a sentence of death.

## ANALYSIS

## JURY SELECTION, MOTIONS, AND GUILT-INNOCENCE ISSUES

**[1]** Defendant assigns multiple instances of error in the jury selection and guilt-innocence proceeding, including his conviction of discharging a firearm into occupied property, but defendant has not presented any argument or cited any authority in support of these assignments. "Assignments of error not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned." N.C. R. App. P. 28(b)(6); *See State v. Augustine*, 359 N.C. 709, 731 n.1, 616 S.E.2d 515, 531 n.1 (2005). As defendant has not supported in his brief any of the above assignments of error, they are taken as abandoned and dismissed.

## "Especially Heinous, Atrocious or Cruel"— Sufficiency of Evidence

**[2]** Defendant argues the State presented insufficient evidence to support submission of the especially heinous, atrocious, or cruel aggravating circumstance (HAC) to the jury. N.C.G.S. § 15A-2000(e)(9) (2005). "In determining whether the evidence is sufficient to support the trial court's submission of the especially heinous, atrocious, or cruel aggravator, we must consider the evidence 'in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom.' " *State v. Flippen*, 349 N.C. 264, 270, 506 S.E.2d 702, 706 (1998) (quoting *State v. Lloyd*, 321 N.C. 301, 319, 364 S.E.2d 316, 328, *judgment vacated on other grounds*, 488 U.S. 807 (1988)), *cert. denied*, 526 U.S. 1135 (1999).

In his brief, Defendant lists many "fact-based propositions," which he argues are not in themselves sufficient to submit the HAC circumstance to the jury. While it is true each of these factors have been held insufficient to submit the HAC circumstance to the jury, these factors were taken in isolation and occurred in cases in which little other evidence to support submission of HAC was present. However, when all the evidence is considered in this case, the circumstance was properly submitted.

Defendant first points out a multiplicity of gunshots inflicted by the perpetrator in rapid succession is insufficient by itself to prove HAC. Additionally, defendant points out that a defendant's disregard of a victim's plea for life, a victim's realization she is about to be killed, a victim's awareness of impending death, and a defendant's calmness and lack of regret are each, taken alone, insufficient to allow the trial court to submit the HAC circumstance to the jury for consideration. Defendant's statements of the law are, at least, partially correct. *See State v. Lloyd*, 354 N.C. 76, 124-26, 552 S.E.2d 596, 629-30 (2001); *State v. Stanley*, 310 N.C. 332, 335-46, 312 S.E.2d 393, 396-401 (1984). Even so, defendant's argument is without merit for the simple reason none of the events stated here occurred in isolation. Instead, the record reflects each and every one of these events occurred in the course of this murder. We reject defendant's argument that the sum of zeros equals zero because such a proposition distorts our precedent on the sufficiency of the evidence of the HAC aggravating circumstance. In determining the sufficiency of the evidence, we look at the evidence *as a whole*, not in the piecemeal manner proposed by defendant. *See State v. Earnhardt*, 307 N.C. 62, 67, 296 S.E.2d 649, 653 (1982).

This Court has previously characterized the types of murders in which submission of the HAC circumstance to the jury would be proper:

> One type includes killings physically agonizing or otherwise dehumanizing to the victim. A second type includes killings less violent but "conscienceless, pitiless, or unnecessarily torturous to the victim," including those which leave the victim in her "last moments aware of but helpless to prevent impending death," A third type exists where "the killing demonstrates an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder."

*State v. Gibbs*, 335 N.C. 1, 61-62, 436 S.E.2d 321, 356 (1993), *cert. denied*, 512 U.S. 1246 (1994) (citations omitted); *see also State v. Haselden*, 357 N.C. 1, 27, 577 S.E.2d 594, 610-11 (victim was shot while begging for her life on her knees), *cert. denied*, 540 U.S. 988 (2003); *State v. Anthony*, 354 N.C. 372, 434-35, 555 S.E.2d 557, 596-97 (2001) (victim shot a second time while already on the ground from the initial shot and begging for her life), *cert. denied*, 536 U.S. 930 (2002); *State v. Golphin*, 352 N.C. 364, 480-81, 533 S.E.2d 168, 243 (2000) (incapacitated victim shot several times while

moaning on the ground), *cert. denied*, 532 U.S. 931 (2001); *State v. Lynch*, 340 N.C. 435, 447-48, 473-74, 459 S.E.2d 679, 683-84, 698-99 (1995) (child victim shot at least seven times while attempting to flee and the defendant continued shooting even while rescuer tried to help victim, wounding the rescuer and eventually killing the victim), *cert. denied*, 517 U.S. 1143 (1996). Defendant's actions, taken as a whole, demonstrate a murder which a jury could find to be especially heinous, atrocious, or cruel.

In this case, the victim pleaded for her life while defendant continued shooting her, showing no mercy as she was prone on the ground. The murder was dehumanizing, because defendant unloaded the capacity of his gun, inflicting multiple gunshots upon his victim. In this process, defendant scarred for life the witnesses to the murder, including the many children present during this tragedy. His victim was unable to retreat or flee, as he began shooting her while she was confined to the passenger compartment of her vehicle. When she finally exited the vehicle, he continued to pursue her, shooting all along the way. As defendant shot Shirley, she knew she was going to die, but there was absolutely nothing she could do to prevent her impending death. Finally, defendant's kicking of his victim, in addition to shooting her on the very spot where her wedding ring would have been, adds to the especially cruel nature of this murder. All of this evidence, taken as a whole, was sufficient to submit the HAC aggravating circumstance to the jury.

Therefore, we hold that submission of the N.C.G.S. § 15A-2000(e)(9) especially heinous, atrocious, or cruel aggravating circumstance to the jury was proper. This assignment of error is overruled.

## Prosecutor's Closing Argument

[3] Defendant next argues the trial court erred by overruling defendant's timely objection during the prosecution's closing argument, thereby allowing the prosecutor to read a statement of the law that was incorrect, incomplete, inapplicable, misleading, and prejudicial to defendant. Specifically, the prosecutor made two statements to which defendant now assigns error.

In attempting to explain HAC, the prosecutor stated:

Judge Thompson, I believe, is going to instruct you as follows. The following is the aggravating circumstance which might be applicable to this case. Was this murder especially heinous,

atrocious or cruel? In this context, "heinous" means extremely wicked, or shockingly evil. "Atrocious" means outrageous [sic] wicked and vile. And "cruel" means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others.

Defendant contends since the prosecutor used the language of the first two paragraphs of the relevant pattern jury instruction but not the latter two paragraphs, this portion of the closing argument is incomplete and misleading. First, we note defense counsel did not object to this language as incomplete or misleading during the closing argument itself. "The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu.*" *State v. Jones*, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002) (citing *State v. Trull*, 349 N.C. 428, 451, 509 S.E.2d 178, 193 (1998), *cert. denied*, 528 U.S. 835 (1999)). " '[T]he impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.' " *State v. Warren*, 348 N.C. 80, 126, 499 S.E.2d 431, 457 (quoting *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979) (alteration in original)), *cert. denied*, 525 U.S. 915 (1998).

During a closing argument "[a]n attorney may . . . on the basis of his analysis of the evidence, argue any position or conclusion with respect to a matter in issue." N.C.G.S. § 15A-1230(a) (2005). "[T]rial counsel is allowed wide latitude in his argument to the jury and 'may argue the law and the facts in evidence and all reasonable inferences drawn from them. . . .' " *State v. Craig*, 308 N.C. 446, 454, 302 S.E.2d 740, 745 (quoting *State v. Kirkley*, 308 N.C. 196, 212, 302 S.E.2d 144, 153 (1983), *overruled in part on other grounds*, *State v. Shank*, 322 N.C. 243, 251, 367 S.E.2d 639, 644 (1988)), *cert. denied*, 464 U.S. 908 (1983). That the prosecutor did not recite the entire pattern jury instruction falls within the prosecuting attorney's latitude and does not constitute gross error, especially in light of the preceding and subsequent arguments that fully explained the aggravating circumstance. Taken in context, this argument was a correct statement of the law and is certainly not gross error. Therefore, this assignment of error is overruled.

**[4]** The second portion of the prosecution's argument to which defendant assigns error was:

The North Carolina Supreme Court has defined 'especially heinous, atrocious or cruel' as follows:

There are three types of murders that would warrant submission of the 'especially heinous, atrocious or cruel' aggravating circumstance. The first type—

[Defense Counsel]: Your Honor, I object.

THE COURT: Objection overruled.

[Prosecuting Attorney]: The first type consists of those killings that are physically agonizing for the victim, or which are in some other way dehumanizing.

The second type includes killings that are less violent, but involve infliction of psychological torture by leaving the victim in her last moments aware of, but helpless to prevent, impending death. And, thus, may be considered conscienceless, pitiless, or unnecessary torturous to the victim.

The third type includes killings that demonstrate an unusual depravity of mind on the part of the defendant beyond that that is normally present in first degree murders.

Because there was a timely objection as to these statements, this Court must determine "whether 'the trial court abused its discretion by failing to sustain the objection.' " *State v. Walters*, 357 N.C. 68, 101, 588 S.E.2d 344, 364 (quoting *Jones*, 355 N.C. at 131, 558 S.E.2d at 106), *cert. denied*, 540 U.S. 971 (2003). The inquiry is a two part one: First, this Court must determine whether the remarks were in fact improper; second, this Court must determine "if the remarks were of such a magnitude that their inclusion prejudiced defendant, and thus should have been excluded by the trial court." *Id.*

The defendant contends the prosecuting attorney's statements were a misrepresentation to the jury because "the passage read to the jury is *not* this Court's *definition* of HAC, but a shorthand summary of three 'types' of murders in which the Court has previously found the legal definition of HAC set forth in the pattern instruction to be sufficiently supported to warrant submission of those instructions to a jury." We disagree.

The prosecutor here did not make an improper comparison between the murder at hand and murders previously found to be espe-

cially heinous, atrocious, or cruel. Instead, the prosecutor merely aided the jury in its understanding of what this Court has held to be types of murders in which HAC could be found by tracing the language used in this Court's cases. *See, e.g., State v. Bell,* 359 N.C. 1, 44, 603 S.E.2d 93, 121 (2004), *cert. denied,* —— U.S. ——, 125 S. Ct. 2299, 161 L. Ed. 2d 1094 (2005). The prosecution's use of the word "defined," while not particularly accurate, was not misleading. After setting out these types of murders, the prosecutor continued by showing how this murder fit within the parameters defined by the law. Inasmuch as we find the prosecutor's statement was not improper, we conclude the trial court did not abuse its discretion in overruling defendant's objection. We therefore overrule defendant's assignment of error.

### Defendant's Closing Argument

[5] Defendant argues the trial court erred by sustaining prosecution objections during defendant's closing arguments in the penalty proceeding, thereby preventing defendant from fully explaining to the jury the decision it was to make concerning HAC. Defense counsel's argument on HAC was as follows:

> Now let's consider the aggravating circumstance tendered by the State in this particular case, which is that this murder was especially heinous, atrocious or cruel.

> One of the things that the Judge's instruction will tell you— first degree murder is heinous, atrocious and usually cruel. I mean, first degree murder is that. That is what we're dealing with with first degree murder. So when the District Attorney talked to you about, you know, things that would be consistent with heinousness and with atrocity and with cruelty, that is always present when you have a first degree murder.

> The Judge will instruct you what the statute says and what you must determine. And this, members of the jury—this is a value judgment that you make based upon the facts that you determine to exist beyond a reasonable doubt. And you must have this value judgment beyond a reasonable doubt.

> In other words, you must eliminate any possibility that this murder was—Yes, heinous, atrocious and cruel in the ordinary sense of first degree murder. Which all have. But that this was not the exceptional, the uniquely heinous, atrocious and cruel first degree murder.

**STATE v. McNEILL**

[360 N.C. 231 (2006)]

Now let's think about the word "especially." What does it mean as we all use it now?

"The choir at church sang beautifully, but Jane's voice was especially beautiful." Now that is the way "especially" is used here, except that it's used not for "especially beautiful", but for "especially, uniquely ugly."

And I will concede to you—I will concede to you that this murder, as it was committed, was heinous, atrocious and cruel. But I would contend to you that the State has not established beyond a reasonable doubt that this murder was especially, uniquely heinous, atrocious or cruel.

. . . .

Members of the jury, let us, as we go through the mitigating circumstances, please understand, and please understand clearly, that the totality of Jimmy McNeill's life prior to April 10th of 2000—the good things that he did are something that you must consider in determining whether this murder was the worst of the worst, and whether this defendant was the worst of the worst.

Now let's consider—I mean, what would be some examples of murders that would be worse?

[Prosecuting Attorney]: Objection.

THE COURT: I'll sustain that.

[Defense Counsel]: The question is whether this murder, in the universe of murders, is the worst. And whether this defendant, in the universe of defendants convicted of first degree murder, is the worst.

I contend to you, clearly, there are worse murders than this. And I contend to you, absolutely, there are a whole lot worse defendants guilty of first degree murder than this.

. . . .

It was a tragic—it was a tragic killing. But it was a tragic killing by an individual who, if you look at it honestly, you could not understand why he did it. This is no excuse for it. But you can see, okay, this person—what he did is not the worst first degree murder. And it has not been committed by the worst defendant.

[Prosecuting Attorney]: Objection. Your Honor, it's not a comparison between cases.

THE COURT: Sustained.

Defendant contends his trial counsel was merely comparing his case to other cases in the same way the prosecutor did in her closing argument. We disagree.

Defendant claims, in essence, "what's good for the goose is good for the gander" and he should have been allowed to make comparisons of his case to previous cases in which HAC was not found, or found and reversed upon appeal, because the prosecution was able to make such a comparison. This assertion mischaracterizes the prosecution's argument. In this case, the prosecution merely set out the law and applied the facts of the present case to the law. For the reasons set out above, this argument is proper. However, defendant began to make comparisons between cases and the facts of each case, something this Court has not allowed. *See State v. Anthony,* 354 N.C. at 429-30, 555 S.E.2d at 593-94 (defendant not allowed to read facts of prior case to jury).

Furthermore, the circumstances of other murders, either actual or imagined, defense counsel believes are more heinous, atrocious, or cruel were not present in the record at the time of closing arguments, and, therefore, counsel may not introduce such evidence in closing. "During a closing argument to the jury an attorney may not . . . make arguments on the basis of matters outside the record except for matters concerning which the court may take judicial notice." N.C.G.S. § 15A-1230(a). Since there was no request for the trial court to take judicial notice of the other murders referenced, defense counsel improperly argued matters outside the record. This assignment of error is therefore overruled.

### Constitutionality of (e)(9) Aggravating Circumstance

[6] Defendant contends the (e)(9) HAC aggravating circumstance is unconstitutionally vague and overbroad, and that this purported vagueness cannot be cured by appellate narrowing on review after *Ring v. Arizona,* 536 U.S. 584 (2002). This Court recently discussed this issue at length in *State v. Duke,* and we find no compelling reason to overrule our precedent. 360 N.C. 110, 623 S.E.2d 11 (2005). Defendant's assignment of error is overruled.

STATE v. McNEILL

[360 N.C. 231 (2006)]

## Constitutionality of Issue Three

[7] Defendant next assigns as error the denial of his motion to change the wording of the Issues and Recommendation as to Punishment form and the correlating jury instructions regarding Issue Three. Specifically, defendant requested the trial court to instruct the jury that it must recommend a sentence of life imprisonment unless it found the aggravating circumstance outweighed the mitigating circumstances. The trial court denied this request. Utilizing the established pattern jury instruction, the trial court instructed the jury:

Issue 3 is, "Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found is or are insufficient to outweigh the aggravating circumstances found by you?"

If you find from the evidence one or more mitigating circumstances, you must weigh the aggravating circumstance against the mitigating circumstances. When deciding this issue, each juror may consider any mitigating circumstance or circumstances that he or she deemed to exist by a preponderance of the evidence in [I]ssue 2.

In so doing, you are the sole judge of the weight to be given to any individual circumstance which you find, whether aggravating or mitigating. You should not merely add up the number of aggravating circumstances and mitigating circumstances. Rather, you must decide from all the evidence what value to give to each circumstance, and then weigh the aggravating circumstance, so valued, against the mitigating circumstances, so valued, and finally determine whether the mitigating circumstance[s] are insufficient to outweigh the aggravating circumstance.

If you unanimously find beyond a reasonable doubt that the mitigating circumstances found are insufficient to outweigh the aggravating circumstance found, you would answer [I]ssue 3 "yes".

If you unanimously fail to so find, you would answer [I]ssue 3 "no".

Defendant argues this instruction violated his constitutional rights because it impermissibly shifted the burden of proof to defendant on this issue by requiring the jury to determine whether the

**STATE v. McNEILL**

[360 N.C. 231 (2006)]

mitigating circumstances found are insufficient to outweigh the aggravating circumstance found, creating a presumption the answer should be "yes." We find defendant's arguments to lack merit and therefore overrule this assignment of error.

Initially, we note it was proper for the trial court to deny defendant's request to change the language in the jury instructions and the Issues and Recommendation as to Punishment form regarding Issue Three. "[R]equested instructions need only be given in substance if correct in law and supported by the evidence." *State v. Morgan*, 359 N.C. 131, 169, 604 S.E.2d 886, 909 (2004), *cert. denied*, —— U.S. ——, 126 S. Ct. 47, 163 L. Ed. 2d 79 (2005). North Carolina's capital punishment statute requires the jury to make the following finding before imposition of the death penalty is allowed: "[T]he mitigating circumstance or circumstances are insufficient to outweigh the aggravating circumstance or circumstances found." N.C.G.S. § 15A-2000(c)(3) (2005). A very similar instruction was upheld as constitutionally sufficient by the Supreme Court of the United States in *Walton v. Arizona*, in which a judge was required to sentence the defendant to death if "one or more aggravating circumstances are found and mitigating circumstances are held insufficient to call for leniency." 497 U.S. 639, 651 (1990) (plurality), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584. North Carolina's capital punishment statute actually provides greater protection against the arbitrary imposition of the death penalty than the statute upheld in *Walton*, as our statute does not mandate death solely on the weighing of aggravating and mitigating circumstances. *See* N.C.G.S. § 15A-2000(b), (c) (2005) (jury must also decide whether the aggravating circumstance or circumstances found are sufficiently substantial to call for imposition of the death penalty). As the instruction proffered by defendant was an incorrect statement of the law articulated in N.C.G.S. § 15A-2000, it would have been improper for the trial court to give that instruction to the jury.

Additionally, we do not believe the instruction as given impermissibly shifted the burden as to Issue Three to defendant by creating a presumption of an affirmative answer. All of the elements required for a jury to make a binding recommendation of death must be proved by the State beyond a reasonable doubt. *See generally Ring v. Arizona*, 536 U.S. 584, 609 (aggravating circumstances must be found by jury beyond a reasonable doubt); *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) (any fact, other than the fact of a prior conviction, that increases penalty for crime beyond prescribed

statutory maximum must be submitted to the jury and proved beyond a reasonable doubt). The instructions given by the trial court did not shift the burden of proof or persuasion on Issue Three to defendant. Specifically, the trial court instructed the jury: "For you to recommend that the defendant be sentenced to death, the State must prove three things beyond a reasonable doubt . . . . Second, that the mitigating circumstances are insufficient to outweigh any aggravating circumstances you have found." The jury was properly instructed.

## INEFFECTIVE ASSISTANCE OF COUNSEL

[8] Defendant argues that because he is not in a position to adequately present an ineffective assistance of counsel claim on direct appeal, the claim should not be procedurally defaulted. Defendant asserts in his brief that defense trial counsel erred when he failed to include a stipulation about defendant's church service to the jury. Testimony was available that defendant had been named "man of the year" by his Baptist church, but defense counsel failed to elicit the testimony or submit the stipulation. Therefore, defendant's request for submission of a nonstatutory mitigating circumstance concerning defendant's service as a trustee of his church was denied.

Defendant is not arguing the substance of his ineffective assistance of counsel claims; instead, he is asking this Court to definitively state that he may raise this issue in a future motion for appropriate relief. Because we are not reviewing the substance of the ineffective assistance claim, we are not required to assess the alleged error under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (the constitutional right to effective counsel is violated when (1) counsel's performance falls below an objective standard of professional reasonableness, and (2) but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different).

N.C.G.S. § 15A-1419 provides a ground for denial of a motion for appropriate relief when, "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so." N.C.G.S. § 15A-1419(a)(3) (2005). Under *State v. Fair*, 354 N.C. 131, 167, 557 S.E.2d 500, 525 (2001), *cert. denied*, 535 U.S. 1114 (2002), a defendant must raise ineffective assistance of counsel claims on direct appeal when those claims are apparent on the face of the record. However, when an appellate court determines further development of the facts would be required before application of the *Strickland* test, the Court should dismiss the

defendant's assignments of error without prejudice. *See State v. Long*, 354 N.C. 534, 539-40, 557 S.E.2d 89, 93 (2001). Here, we believe further inquiry is required into these allegations of ineffective assistance of counsel. Therefore, we dismiss without prejudice defendant's claim of ineffective assistance of counsel.

## PRESERVATION ISSUE

Defendant argues the murder indictment was constitutionally inadequate because it failed to allege any capital aggravating circumstances. Defendant concedes this is a preservation issue, stating: "This Court has repeatedly held that North Carolina's short form murder indictment pursuant to N.C.G.S. § 15-144 is sufficient to allege first-degree murder and to sustain a death sentence." We previously addressed this issue in *State v. Hunt*, 357 N.C. 257, 268-78, 582 S.E.2d 593, 600-07, *cert. denied*, 539 U.S. 985 (2003); *see also State v. Mitchell*, 353 N.C. 309, 328-29, 543 S.E.2d 830, 842, *cert. denied*, 534 U.S. 1000 (2001); *State v. Davis*, 353 N.C. 1, 44-45, 539 S.E.2d 243, 271 (2000), *cert. denied*, 534 U.S. 839 (2001); *State v. Braxton*, 352 N.C. 158, 173-75, 531 S.E.2d 428, 436-38 (2000), *cert. denied*, 531 U.S. 1130 (2001). Defendant presents, and we find, no compelling reason to depart from our prior precedent. We therefore overrule defendant's assignment of error.

## PROPORTIONALITY

[9] Having concluded defendant's trial and capital sentencing proceeding were free from prejudicial error, we must now determine: (1) whether the record supports the aggravating circumstance found by the jury and upon which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *See* N.C.G.S. § 15A-2000(d)(2) (2005).

As to the first two of these tasks, when "there is evidence to support the aggravating factors relied upon by the State . . . the jury's balancing of aggravation and mitigation will not be disturbed unless it appears that the jury acted out of passion or prejudice or made its sentence arbitrarily." *State v. Zuniga*, 320 N.C. 233, 273, 357 S.E.2d 898, 923, *cert. denied*, 484 U.S. 959 (1987). In the instant case, defendant was convicted of first-degree murder. His conviction was based upon the felony murder rule and upon a theory of malice, premeditation, and deliberation. Following defendant's capital sentencing pro-

ceeding, the prosecution submitted only the (e)(9) aggravating circumstance for the jury's consideration: "Was this murder especially heinous, atrocious, or cruel?" The jury found that aggravating circumstance to exist.

The jury also found three enumerated statutory mitigating circumstances: The defendant has no significant history of prior criminal activity ((f)(1)); the murder was committed while the defendant was under the influence of mental or emotional disturbance ((f)(2)); and the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired ((f)(6)). Additionally, the jury found the (f)(9) mitigating circumstance: "[A]ny other circumstance or circumstances arising from evidence which the jury deems to have mitigating value." N.C.G.S. 15A-2000(f)(9) (2005). Of the ten non-statutory mitigating circumstances submitted, one or more jurors found by a preponderance of the evidence that five existed and had mitigating value.

After thoroughly reviewing the record, transcripts, and briefs in this case, we conclude the evidence fully supports the aggravating circumstance found by the jury. Further, we conclude nothing in the record suggests defendant's death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. Accordingly, we will not disturb the jury's balancing of aggravating and mitigating circumstances on appeal.

> Turning now to our final statutory duty, we recognize that proportionality review is designed to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." In conducting the proportionality review, we must determine whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2). This determination " 'ultimately rest[s] upon the "experienced judgments" of the members of this Court.' " (alteration in original).

*State v. Garcia*, 358 N.C. 382, 426, 597 S.E.2d 724, 754 (2004), *cert. denied,* —— U.S. ——, 125 S. Ct. 1301, 161 L. Ed. 2d 122 (2005) (citations omitted).

Defendant argues this Court should suspend the consideration of death penalty cases because it is not in a position to make the comparisons required by N.C.G.S. § 15A-2000(d)(2). The relevant statute provides:

The sentence of death shall be overturned and a sentence of life imprisonment imposed in lieu thereof by the Supreme Court upon a finding . . . that the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The Supreme Court may suspend consideration of death penalty cases until such time as the court determines it is prepared to make the comparisons required under the provisions of this section.

*Id.* Defendant contends that the "similar cases" referenced in the statute must include similar life imprisonment cases as well as similar death cases. Defendant argues that since the North Carolina General Assembly amended N.C.G.S. § 7A-27(a) in 1995 so that first-degree murder cases resulting in a life sentence would no longer come before this Court without first being decided by the Court of Appeals, the pool of available cases is unfairly skewed towards death cases to use in comparison.

Defendant's argument misconstrues our proportionality review. We consider all cases which are roughly similar in facts to the instant case, although we are not constrained to cite each and every case we have used for comparison. *See State v. Al-Bayyinah*, 359 N.C. 741, 760, 616 S.E.2d 500, 514 (2005). We decline defendant's suggestion to suspend consideration of death penalty cases, and now turn to the proportionality of the case at bar.

This Court has previously determined that the death penalty was disproportionate in eight cases. *State v. Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled in part on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). In only two of these cases, *Stokes* and *Bondurant*, did the jury find as an aggravating circumstance that the murder was especially heinous, atrocious, or cruel. Both *Stokes* and *Bondurant* are easily distinguished from the case at bar.

In *Stokes*, the seventeen-year-old defendant was the only one of four assailants to receive the death penalty, even though the other three assailants were adults. 319 N.C. at 3-4, 21, 352 S.E.2d at 654-55,

664. In the instant case, defendant was not an immature adolescent. He was forty-seven years old at the time he murdered his wife. He had been married for almost twenty-five years, had spent twenty years serving his country in the United States Army, was a combat veteran, received several promotions, was a noncommissioned officer, and had served on the governing council of his town for almost seven years. He additionally served for a time as police commissioner of the Town of Wagram. Furthermore, he had no peers encouraging him to murder his wife; in fact, several people whom he had known for years pleaded with him to stop.

In *Bondurant*, the defendant was remorseful and apologetic immediately after shooting the victim, and he directed the victim's transport to the hospital for treatment after the shooting because he did not want the victim to die. 309 N.C. at 694, 309 S.E.2d at 182-83. Unlike the defendant in *Bondurant*, defendant in the instant case showed no remorse or apology. After firing every cartridge contained by his rifle, defendant's final insult was to kick his wife as he walked back to his pickup truck. He made no attempt to apologize, no attempt to help her, or even check to see if she was still alive. Defendant was so unconcerned he had just murdered his wife he went to a friend's house to return a lawnmower part after a half-hearted attempt to notify the police of his actions. This murder does not contain any compelling reason for a finding of disproportionality when compared to cases in which we have found disproportionality.

"Although we 'compare this case with the cases in which we have found the death penalty to be proportionate. . . . we will not undertake to discuss or cite all of those cases each time we carry out that duty.' " *State v. Garcia*, 358 N.C. at 429, 597 S.E.2d at 756 (quoting *State v. McCollum*, 334 N.C. 208, 244, 433 S.E.2d 144, 164 (1993), *cert. denied*, 512 U.S. 1254 (1994)). We have compared defendant's case to other cases in which we have found the death penalty to be proportionate and find no reason to hold defendant's sentence is disproportionate.

Accordingly, we find defendant's sentence is proportionate to the crime he committed. Defendant received a fair trial and sentencing proceeding, and we find no reversible error in his convictions or his sentences.

NO ERROR.